Mohammad SAMI, Appellant,

v.

UNITED STATES of America et al.

No. 78–1975.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 19, 1979.

Decided Dec. 28, 1979.

William W. Becker, Washington, D. C., with whom Virginia A. McArthur, Washington, D. C., was on the brief, for appellant.

E. Anne McKinsey, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert,* U. S. Atty., John A. Terry and Michael W. Farrell, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellees.

Before McGOWAN, LEVENTHAL ** and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

---

* United States Attorney at the time the brief was filed.

** Circuit Judge Leventhal was a member of the panel which considered this case but died before the opinion was issued.

WALD, Circuit Judge:

This case is a tragedy of errors. It represents an extension of and embroils the United States Government and its officials in what a Maryland appellate court has called "an almost incredible history of marital warfare, with skirmishes occurring up and down the eastern seaboard of this country, as well as abroad." *Sami v. Sami,* 29 Md.App. 161, 163–64, 347 A.2d 888, 890 (1975).

## I. FACTUAL BACKGROUND

For more than a year preceding the events which gave rise to this suit, plaintiff, a citizen of Afghanistan and an economist stationed at the International Monetary Fund in Washington, had been engaged in a custody dispute with his American wife over their two children. Each had secured in different states, he in Maryland, she in Florida, a court order granting custody over the offspring. At the time of this latest chapter, the children were physically in Florida. Their father had consulted with Washington, D. C. counsel concerning his children's custody. He was advised to go to Florida and physically bring the children back to Maryland where he had legal custody. His District of Columbia counsel also told him to consult with Florida counsel about the legality of such action. Florida counsel warned him that he would technically be violating Florida law if he removed the children.

Plaintiff went to Florida, and together with a detective hired to assist him for this purpose, transported the children back to Maryland. Plaintiff and the children arrived in Maryland on May 10. Shortly after plaintiff's arrival there, upon information supplied by Mrs. Sami and presented to a state judge in Broward County, Florida, two warrants were issued for plaintiff's arrest for taking the children out of state in violation of a Florida court order. Upon the request of the Broward County Sheriff's Department, and on the basis of the Florida warrants, a Maryland court on May 11 issued a warrant for plaintiff's arrest. Plaintiff was arrested, appeared in court,

and was released on posting a personal recognizance bond of $1000 pending a hearing set for June 19. A condition of the bond was that he not change "residence" in the meantime. The bond did not require that he or the children remain in Maryland, or in the country.

Suspecting plaintiff intended to leave the country with the children, Mrs. Sami, her father and her counsel sought intervention by the United States National Central Bureau (USNCB), of the Department of the Treasury, this country's liaison with the International Criminal Police Organization (Interpol), to stop him. The first contact with the USNCB was made on May 9. On May 12, when Mrs. Sami informed defendant Sims, chief of the USNCB, of plaintiff's and the children's imminent departure from the country, she was told to contact the FBI, Dulles Airport Police and the State Department. Although detained for a few minutes (without the intervention of USNCB), the plane was permitted to leave.

Mrs. Sami had informed the USNCB the day before of the outstanding Florida warrant for plaintiff's arrest. The warrant's existence was not confirmed, however, until Sims contacted the Florida sheriff's office after the plane's departure. Shortly after verifying the Florida warrants Sims was advised by Mrs. Sami's lawyer that a Maryland judge intended to issue a bench warrant for plaintiff's arrest the next morning. Sims confirmed that intent by placing a telephone call to the judge.

Mrs. Sami's father had earlier been counselled by defendant Holmes, Deputy Chief of the USNCB, that the USNCB could do nothing without a request from a law enforcement agency. In response to still another communication after the plane departed, Mrs. Sami's lawyers were told by Sims that foreign police departments would not be notified of the outstanding Florida warrants until the Broward County Florida State's Attorney replied to a USNCB inquiry regarding that Attorney's desire to have the plaintiff arrested and that Attorney's intention to seek extradition. Shortly after this conversation with Mrs. Sami's

attorneys, Sims was advised by the Broward County Sheriff's office that the State's Attorney had authorized plaintiff's arrest and the initiation of extradition proceedings. Sims knew at the time that only the State Department and not a state or any of its officers or instrumentalities could request extradition from a foreign jurisdiction.

Beginning that evening and continuing throughout the next two days, Sims dispatched a flurry of messages to Interpol liaisons at several points on the plaintiff's expected route, including London, Rome and Wiesbaden. The first said that plaintiff was wanted on a Florida warrant,[1] requested his immediate arrest, and stated that "Florida will extradite." Among the reply communications received was one from Rome stating that Italian authorities could do nothing because the warrant was issued in a civil dispute which in their jurisprudence did not justify extradition. On May 13 Sims sent communiques to several Interpol liaisons, including Wiesbaden, which a) stated that the "United States [rather than Florida] will extradite," b) stated that the Maryland custody order was good only in Maryland and had been superseded by an arrest warrant for plaintiff issued by a Maryland court, and c) characterized the Maryland arrest warrant as a felony warrant. Sims later admitted on deposition that a) when he said the "United States will extradite" he meant Florida would ask the United States to extradite, b) that he just assumed from his conversation with the Maryland judge that a bench warrant on the bond "superseded" the Maryland order granting custody and c) that he had no basis for saying that the Maryland warrant was for a felony. He also admitted that at no time in the unfortunate incident did he contact anyone in the State or Justice Departments to clarify any of this and that he had not read the German-American extradition treaty until after the incident was over.

On May 14 the German authorities arrested plaintiff at Frankfurt, gave the children over to their mother who had been following the plane, and detained plaintiff. The following morning they notified Sims of their action and requested in two communications that the formal extradition request quickly be forwarded through diplomatic channels. On May 16 the State Department determined that no extraditable offense was involved. German officials were so informed both by Sims and through diplomatic channels and were requested to release plaintiff. Although this message appears to have been conveyed on May 16, plaintiff was not in fact released until May 18, four days after his original detention.

The incident provoked the sending of a note from the Afghanistan Embassy to the State Department, and a reply from the State Department, referring to plaintiff's detention as "improper." A meeting held June 3, 1975, between Departments of State and Justice and USNCB officials resulted in guidelines under which USNCB undertook to consult with the State Department before notifying other countries that a request for provisional arrest will be forwarded through diplomatic channels.

Plaintiff brought suit against Interpol, the United States Government and USNCB officials Sims and Holmes individually for false arrest and imprisonment, libel and slander, and deprivation of his fourth and fifth amendment constitutional rights. The case comes to us on appeal from dismissals of all claims.[2] Summary judgment in favor of defendants United States and Holmes was granted on October 19, 1977. The claims against defendant Interpol were dismissed the same day. Summary judgment in favor of defendant Sims was granted on July 22, 1978. We now consider the claims against each defendant separately.

## II.  PLAINTIFF'S CLAIM AGAINST INTERPOL

Interpol is an organization whose aims, according to its constitution, are "(a) to

---

1.  The message stated, incorrectly, that the Florida warrant was issued on *March* 10, 1975.

2.  Plaintiff does not appeal the dismissal of his action against defendant Holmes.

ensure and promote the widest possible mutual assistance between all criminal police authorities within the limits of the law existing in the different countries and in the spirit of the 'Universal Declaration of Human Rights'"; and "(b) to establish and develop all institutions likely to contribute effectively to the prevention and suppression of ordinary law crimes." Interpol Const. art. 2 (1968), Joint Appendix (J.A.) 243.

Interpol has linked offices designated by its various members and its own Paris headquarters with a worldwide radio network. Congress has been informed that "INTERPOL's function is to provide the coordination and communications mechanism for law enforcement agencies (local, state or Federal) having a foreign investigative requirement and to transmit that requirement to other appropriate foreign law enforcement agencies." *Treasury, Postal Service and General Government Appropriations for Fiscal Year 1977: Hearings on H.R. 14261 before the Subcomm. on Treasury, Postal Service and General Government of the Senate Comm. on Appropriations,* 94th Cong., 2d Sess. 169 (February 24, 1976) (statement of David R. Macdonald, Assistant Secretary of Treasury (Enforcement, Operations and Tariff Affairs)) [hereinafter cited as *1976 Senate Appropriations Hearings*].

The United States' participation in Interpol has been authorized by statute. 22 U.S.C. § 263a (1976). The United States has designated the USNCB, formerly of the Department of Treasury, now of the Justice Department, to act as this country's Interpol liaison. USNCB employs several full-time employees, including, at the time of these events, defendants Sims and Holmes.

■ Plaintiff attempted to obtain jurisdiction over Interpol by serving Sims and by serving Stuart Knight, the director of the United States Secret Service and a vice-

president of Interpol. Interpol did not respond although the United States Attorney for the District of Columbia, in response to plaintiff's motion for a default judgment against Interpol, moved for and was granted leave as *amicus curiae* to "suggest" lack of proper service. Plaintiff had made service under Rule 4(d)(7), Fed.R.Civ.P. invoking Section 13–334 of the District of Columbia Code, alleging that Interpol was a corporation "which does business . . . in Washington, D. C.," and that Sims and Knight were its "agents."[3] The court concluded, however, that Interpol was not "doing business" in the District of Columbia, denied plaintiff's motion for default and dismissed the action as against Interpol. We affirm the district court's dismissal in this respect.

*International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), remains the touchstone for analysis of the constitutional limitations on a court's exercise of personal jurisdiction. *International Shoe* is perhaps best and most frequently remembered for its use of the words "minimum contacts," *id.* at 316, 66 S.Ct. 154, but that phrase did not denote a mechanical or quantitative assessment of the defendant's activities. *Id.* at 319, 66 S.Ct. 154. The Court clearly thought the relationship between a defendant's contact with the state and the claim asserted against that defendant of considerable importance. *Id.* at 319, 320, 66 S.Ct. 154. The test is one which must look to the totality of the circumstances. *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 445–46, 72 S.Ct. 413, 96 L.Ed. 485 (1952).

Taken as a whole this record does not support plaintiff's argument that in the sending or receiving of messages this country's National Central Bureau designated in accordance with the Interpol constitution, USNCB, acts as an agent of Interpol. The record tends rather to suggest that the

---

**3.** Plaintiff originally argued the propriety of service under Fed.R.Civ.P. 4(d)(3), but apparently abandoned this argument later. We think plaintiff has failed to establish that the court has personal jurisdiction over this defendant under *International Shoe, infra,* regardless of the method by which service was effected. Thus, neither the reasoning nor the result of our decision here would have been different if Rule 4(d)(3) had been argued on appeal.

USNCB acted exclusively as an agent of the national government which created, staffed, financed and equipped it. For example, the parties have stipulated that the USNCB is a bureau of the U. S. Treasury,[4] that it answers to the Assistant Secretary of the Treasury and to Congress, that it functions in an information liaison capacity,[5] that it employs eleven persons full-time, that all USNCB employees' salaries are paid by the U. S. government, and that USNCB has franking privileges and uses both Interpol telex equipment and telecommunications facilities owned and operated by the U. S. government. Nothing in the record indicates that the USNCB employees take orders or receive binding instructions in the performance of their duties from Interpol. Thus the contacts which Interpol has with the forum do not, insofar as appears from this record, consist of the presence within the forum of "agents" for the exchange of law enforcement messages.

Nor does the record establish that the USNCB communications received in this forum from abroad were initiated by Interpol or agents of Interpol. From all that appears the officials sending the messages operated in a capacity strictly analogous to our own USNCB officials, i. e., as agents of their own states' governments. Thus their communications, received here, cannot suffice as a predicate for personal jurisdiction. Other contacts with the forum supported or even suggested by the record [6] do not themselves demonstrate substantial contact and are individually and collectively too remote from the wrongs alleged to warrant the exercise of personal jurisdiction in this case. See Data Disc, Inc. v. Systems Technology Associates, Inc., 557 F.2d 1280, 1287–88 (9th Cir. 1977). See also Traher v. De Havilland Aircraft of Canada, Ltd., 111 U.S.App.D.C. 33, 294 F.2d 229 (D.C.Cir. 1961) (per curiam) (construing "doing business" within the meaning of the D.C. statute); Mueller Brass Co. v. Alexander Milburn Co., 80 U.S. App.D.C. 274, 152 F.2d 142 (D.C.Cir. 1945) (same). Compare Perkins v. Benguet Consolidated Mining Co., supra.

4. As noted above, the USNCB is now located within the Justice Department.

5. The parties' stipulation on the "function and mission" of USNCB is set out at length at note 6, infra.

6. Stuart Knight, as vice-president of Interpol, was a member of that organization's Executive Committee. The Interpol constitution provides that the Executive Committee's responsibilities shall include:
    a) Supervis[ing] the execution of the decisions of the General Assembly,
    b) Prepar[ing] the agenda for sessions of the General Assembly,
    c) Submit[ting] to the General Assembly any programme of work or project which it considers useful,
    d) Supervis[ing] the administration and work of the Secretary General,
    e) Exercis[ing] all the powers delegated to it by the Assembly.
Interpol Const. art. 22 (1968), J.A. 245. It further provides:
    In the exercise of their duties, all members of the Executive Committee shall conduct themselves as representatives of the Organization and not as representatives of their respective countries.
Id. art. 21. Moreover, it provides that each member's national central bureau shall "ensure liaison with [inter alia] the Organization's General Secretariat." Id. art. 32; J.A. 246. Plaintiff has not proved the actual existence of the kinds of contacts in the District of Columbia which the Interpol constitution suggests may arise when a member of the Interpol Executive Committee is located here (that is, it has not proved that Knight performed any of his Interpol responsibilities here) and he has not proved that the USNCB acts in any capacity other than the sending or receiving of messages to or from law enforcement officials in other countries. Indeed the parties have stipulated that
    [t]he function and mission of U. S. NCB is liaison with foreign police departments and liaison and assistance to domestic law enforcement agencies with regard to criminal activity abroad. It includes the reception, classification, filing, exchange and dissemination of information on criminal police matters.
But even if there were proof that such contacts had been performed here we think they would probably not have evinced the kind of "substantial" contacts required by International Shoe and they are, in any event, too remote from the wrongs alleged to function as a predicate for jurisdiction. Because we so hold we need not reach the argument made by appellee that Knight is statutorily prohibited from acting as an agent of Interpol. 18 U.S.C. § 219 (1976).

## III. PLAINTIFF'S CLAIM AGAINST THE UNITED STATES

### A. *The District Court's Basis For Dismissal*

Plaintiff sued the United States under the 1974 amendment to the Federal Tort Claims Act (hereinafter the "Act" or the "FTCA"), Pub.L. 93–253, § 2, 88 Stat. 50 (1974), codified at 28 U.S.C. § 2680(h) (1976), a special proviso to the specific prohibition under the Act of liability for claims "arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." The 1974 amendment permits claims with regard to the acts of "investigative or law enforcement officers of the United States Government" for "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution." *Id.*

The United States below argued against the applicability of the 1974 proviso on the ground that while Sims' job classification brought him within the proviso's definition of a "federal investigative or law enforcement officer" as one who "is empowered by law to execute searches, to seize evidence, or to make arrests for violation of the Federal law," *id.,* his duties as Chief of the USNCB did not involve such responsibilities and the 1974 amendment meant to cover only investigative and law enforcement officers while engaged in the performance of the duties described in the statutory definition. Since Sims in his role as Interpol liaison did not execute searches, seize evidence, or make arrests for violation of Federal law, the government argued, claims arising from his performance as Interpol liaison are not covered by the Act.

The district court, however, dismissed the United States as a defendant not on this ground but on a second ground argued by the government, *viz.,* the FTCA's exception for "claim[s] arising in a foreign country." 28 U.S.C. § 2680(k) (1976). The court reasoned that plaintiff would have no case of false arrest or imprisonment if an arrest had not occurred and the arrest in this case occurred in Germany; hence the claim "arose" in a foreign country. *Cf.* Restatement of Conflict of Laws, § 377 (1934) (tort arises where last event necessary to liability occurs). The district court relied additionally on policy considerations it thought underlay the exception. Prosecution of the suit would require German witnesses and experts on German law to show on what basis plaintiff was actually arrested and detained; it was necessary to plaintiff's case to show both that the arrest was without legal justification and that it was in fact caused by negligent or wrongful acts of the United States officials. The district judge thought that "[i]n accord with the intent of § 2680(k), the liability of the United States should not be dependent on these evidentiary difficulties and considerations of foreign law" and, accordingly, dismissed the claim against the United States.

### B. *The Foreign Country Exception, 28 U.S.C. § 2680(k) (1976)*

We are not satisfied that if the act or omission complained of occurred in this country, the foreign country exception would apply under the decided cases or should apply given the language of the exception in the context of the Act, the overall approach of the Act to the analysis of liability for tort claims, the legislative intent which appears to underlie the exception, and the policy considerations which might inform our interpretation of the exception.

The entire scheme of the FTCA focuses on the place where the negligent or wrongful act or omission of the government employee occurred. 28 U.S.C. § 1346(b) (1976). Thus, if the negligent or wrongful act occurred in Oklahoma, but the only injury suffered occurred in Missouri, recovery may be had only if Oklahoma's law (including its choice of law principles) renders a private individual liable under similar circumstances. *Richards v. United States,* 369 U.S. 1, 9–10, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

The district court concluded that under the foreign country exception the tort of

false arrest cannot logically "arise" here when the arrest occurs abroad. Whatever its logic, however, the FTCA, for purposes of imposing liability, focuses on the place of the government employee's act or omission. We think that the exception for claims arising in a foreign country should be read consonantly with the statutory scheme.[7]

Decisions interpreting § 2680(k), the foreign country exception, are few. *United States v. Spelar,* 338 U.S. 217, 220–21, 70 S.Ct. 10, 94 L.Ed. 3 (1949), contains a discussion of what the Congress thought it was about when it made the exception. The discussion supports plaintiff's argument that the exception does not apply if the wrongful acts or omissions complained of occur in the United States. *Spelar* quotes the following interchange during hearings on a predecessor bill (H.R. 6463, 77th Cong., 2d Sess. (1942)) in which "the [foreign] exemption provision assumed the form which was ultimately enacted into law." 338 U.S. at 220, 70 S.Ct. at 12.

MR. SHEA [Assistant Attorney General, explaining the revised language suggested by the Attorney General]. Claims arising in a foreign country have been exempted from this bill, H.R. 6463, whether or not the claimant is an alien. Since liability is to be determined by the law of the situs of the wrongful act or omission it is wise to restrict the bill to claims arising in this country. This seems desirable because the law of the particular State is being applied. Otherwise, it will lead I think to a good deal of difficulty.

MR. ROBSION [Member of the House Committee on the Judiciary]. You mean by that any representative of the United States who committed a tort in England or some other country could not be reached under this?

MR. SHEA. That is right. That would have to come to the Committee on Claims in the Congress.

*Id.* at 221, 70 S.Ct. at 12, *citing Tort Claims: Hearings on H.R. 5373 and H.R. 6463 before the House Comm. on the Judiciary,* 77th Cong., 2d Sess. 35 (January 29, 1942).

No case to our knowledge has held the United States exempt from liability for acts or omissions occurring here which have their operative effect in another country. Indeed, to the extent the decided cases address the issue at all, they have come to a contrary conclusion. *Leaf v. United States,* 588 F.2d 733 (9th Cir. 1978) (section 2680(k) does not exempt U.S. from liability for negligence in this country which was alleged to have caused airplane damage in Mexico); *In re Paris Air Crash of March 3, 1974,* 399 F.Supp. 732, 737 (C.D.Cal.1975) (negligence in this country, personal injury in France). *See also Roberts v. United States,* 498 F.2d 520, 522 n.2 (9th Cir.), *cert. denied,* 419 U.S. 1070, 95 S.Ct. 656, 42 L.Ed.2d 665 (1974); *Bryson v. United States,* 463 F.Supp. 908 (E.D.Pa.1978).

It is entirely understandable that Congress should wish to avoid the risk of United States' exposure to unreasonable liability under foreign law over which this country had no control. This we take to be the primary import of the exchange quoted in *Spelar* and set out above. It was not, we think, the difficulty of ascertaining foreign law but the prospect of unreasonably imposed liability[8] which actuated the exemp-

---

7. A close reading of the statute supports this interpretation. Each of the exemptions contained in § 2680 begins with the words "any claim." In all except § 2680(k) these words are followed by a description of acts or omissions exempted. Thus § 2680(a): "Any claim based upon an act or omission of an employee of the Government, exercising due care, [etc.]"; § 2680(e): "Any claim arising out of an act or omission of any employee of the Government in administering the provisions of sections 1–31 of Title 50, Appendix."

We do not think the omission of a specific reference to acts or omissions in § 2680(k) was meaningful or that the focus of that exemption shifted from acts or omissions to resultant injuries. What must be *in* a foreign country under the exemption is, we think, not a "claim arising" but "an act or omission of an employee of the government."

8. The statute, as Mr. Shea noted in the hearings quoted above, determines liability "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b) (1976). After quoting the excerpt from the

tion. But this policy consideration has little bearing on a case where the acts or omissions complained of occurred in this country because in such cases liability will be determined under this country's law. 28 U.S.C. § 1346(b) (1976).

It is true that the FTCA compels only application of this country's choice of law principles, *Richards, supra,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492, and not its substantive law of liability. Nevertheless prevailing conflicts principles in the District of Columbia and elsewhere (in the absence of countervailing statutory direction) permit application of an alternate substantive law [9] when foreign law conflicts with a strong public policy of the forum. *See generally* Paulsen & Sovern, *"Public Policy" in the Conflict of Laws,* 56 Colum.L.Rev. 968 (1956). See also Restatement (Second) of Conflict of Laws § 6(2)(b) (1971) (relevant

policies of the forum one of many factors in choice of law).[10] Application of such principles will preserve the United States from unreasonably imposed liability.

The difficulties of obtaining evidence from abroad might have concerned Congress in enacting the foreign country exemption, but there is no evidence that it did so.[11]

## C. The Law Enforcement Officer Proviso, 28 U.S.C. § 2680(h) (1976)

Our conclusion that the claim is not exempt under § 2680(k) does not, however, end our inquiry. For, as already mentioned, the government argues that the newly broadened liability under § 2680(h) [12] does not apply to officers who do not themselves make arrests, seize evidence, etc. Even if the § 2680(h) proviso does apply to such officers, the government continues, the

---

hearings set out at length above, the Court in *Spelar* concluded, "In brief, though Congress was ready to lay aside a great portion of the sovereign's ancient and unquestioned immunity from suit, it was unwilling to subject the United States to liabilities depending upon the laws of a foreign power. The legislative will must be respected." 338 U.S. at 221, 70 S.Ct. at 12.

9. *Home Ins. Co. v. Dick,* 281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926 (1930) (reasonable relationship between the state whose law is applied and the events or parties involved prerequisite to application of that state's law).

10. *But cf. id.* § 90 ("[n]o action will be entertained on a foreign cause of action the enforcement of which is contrary to the strong public policy of the forum"). Comment a to § 90 states that the rule is narrow and does not apply to choice of law on particular issues.

11. We note that the rule applied by the district court would not avoid the "evidentiary difficulties and considerations of foreign law" inherent in a converse set of facts, *i. e.,* where the act or omission occurs abroad and the injury here. If under the § 2680(k) exemption a claim arises where the last event necessary to liability occurs, claims will "arise" in the United States when the tortious acts or omissions occurred abroad, and the foreign country exemption will not apply to those claims. Thus, unless another exemption applies, a government employee's wrongful acts or omissions abroad which have operative effect in this country will be actionable here under the FTCA and the difficulties of transporting foreign witnesses and of ascertaining the foreign law will not be avoided. More

importantly, however, such an interpretation would create liability under the law (including choice of law principles) of a place over which the United States has no control, because FTCA liability is determined by the law of the place where the wrongful or negligent act or omission occurred. 28 U.S.C. § 1346(b) (1976).

Under prevailing choice of law principles, only if *all* torts with any foreign connections were exempted under § 2680(k) would the difficulties of finding evidence and ascertaining foreign law be avoided. This is not what Congress did in enacting § 2680(k).

12. Section 2680(h) now excepts the United States for liability from:

Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: *Provided,* That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

28 U.S.C. § 2680(h) (1976).

"discretionary function" exception contained in § 2680(a) exempts the United States from liability for the actions complained of here. ·

The application of § 2680(h) to persons like Sims who have been classified by the United States Civil Service as "criminal investigator[s]" [13] even though their present duties do not involve frontline law enforcement work is a novel one, not solved by resort to the brief legislative history or to already decided cases. In this case the government stipulated that the USNCB was staffed professionally only by trained law enforcement personnel and Congress has been assured that requests for criminal information will be handled only by persons so trained.[14] On the other hand, it is also admitted that the USNCB officers do not initiate or conduct investigations of their own but act primarily as conduits and screeners of information between foreign police departments and federal and state counterparts.[15]

The Senate report on the amendment to § 2680(h) describes its purpose broadly:
The effect of this provision is to deprive the Federal Government of the defense of sovereign immunity in cases in which Federal law enforcement agents, acting within the scope of their employment, or under color of Federal law, commit any of the following torts: assault, battery, false imprisonment, false arrest, malicious prosecution or abuse of process. . . . Furthermore, this provision should be viewed as a counterpart to the *Bivens* case and its progeny [sic], in that it waives the defense of sovereign immunity so as to make the Government inde-

pendently liable in damages for the same type of conduct that is alleged to have occurred in *Bivens* (and for which that case imposes liability upon the individual Government officials involved).

.    .    .    .    .

This whole matter was brought to the attention of the Committee in the context of the Collinsville raids, where the law enforcement abuses involved Fourth Amendment constitutional torts. Therefore, the Committee amendment would submit the Government to liability whenever its agents act under color of law so as to injure the public through search and seizures that are conducted without warrants or with warrants issued without probable cause. However, the Committee's amendment should not be viewed as limited to constitutional tort situations but would apply to any case in which a Federal law enforcement agent committed the tort while acting within the scope of his employment or under color of Federal law.

S.Rep. No. 588, 93rd Cong., 1st Sess. 3–4 (1973).

We deduce from this report an intent to "provid[e] a remedy against the Federal Government for innocent victims of Federal law enforcement abuses," *id.* at 4, and we find no indication that it was not meant to cover the situation where law enforcement officers are assigned to duties that do not involve their actual participation in making arrests or conducting investigations. By defining "investigative or law enforcement officer" and by limiting the wrongs covered in the § 2680(h) exception to false arrest, false imprisonment, malicious prosecution

---

13. The parties had stipulated as follows:
   Throughout May of 1975 and at the present time, Mr. Sims has been classified by the United States Civil Service as a criminal investigator, a law enforcement officer within the meaning of 28 U.S.C. § 2680(h). Defendants do not agree that as Chief of NCB, Sims was acting as a law enforcement officer within the meaning of 28 U.S.C. § 2680(h).

14. *See Treasury, Postal Service and General Government Appropriations for Fiscal Year 1977: Hearings before the Subcomm. on the Treasury, Postal Service and General Govern-*

*ment Appropriations of the House Committee on Appropriations,* 94th Cong., 2d Sess. 37–38 (January 26, 1976); *1976 Senate Appropriations Hearings* at 198. *See also* U.S. Department of the Treasury, Comptroller General of the United States, United States Participation in Interpol, the International Criminal Police Organization 6 (December 27, 1976) [hereinafter cited as Comptroller General's Report], J.A. 271 *et seq.*

15. Comptroller General's Report 8.

or abuse of process, Congress set finite boundaries around the kind of law enforcement abuses for which it wished to make the government liable.

We are not inclined to read into the language which Congress used a narrower limitation on liability than that suggested by the plain meaning of the words. In our view Sims was an "investigative or law enforcement officer of the United States Government" within the meaning of the 1974 proviso. Whether the complaint otherwise states a claim for which the United States is not exempt from liability under § 2680(h) is a question we leave to the district court on remand.[16]

## D. *The Discretionary Function Exemption, 28 U.S.C. § 2680(a) (1976)*

■ The government asserts that the United States would have been immune from suit in any event pursuant to the statutory exception in § 2680(a) which provides that the United States shall not be liable for acts "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or any employee of the Government, whether or not the discretion involved, be abused." 28 U.S.C. § 2680(a) (1976).

This "discretionary function exception" to the FTCA has spawned much litigation. After initial confusion following the Supreme Court's broad construction of the exception in *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), many courts, including our own, accepted a distinction based upon language in that case to the effect that "operational" duties as opposed to "planning" duties did not fall within the exception, even though the former inevitably required judgment and discretion. Thus in *Eastern Airlines, Inc. v. Union Trust Co.,* 95 U.S.App.D.C. 189, 221 F.2d 62, aff'd mem. sub nom., *United States v. Union Trust Co.,* 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 799 (1955), we decided that negligent acts of airport control tower operators were not within the exception. "[D]iscretion was exercised when it was decided to operate the tower, but the tower personnel had no discretion to operate it negligently." 95 U.S.App.D.C. at 204, 221 F.2d at 77. The Supreme Court's decision in *Indian Towing Co. v. United States,* 350 U.S. 61, 69, 76 S.Ct. 122, 126–27, 100 L.Ed. 48 (1955), offers support for such a distinction. In that case the Court ruled the government could be held liable under the FTCA for negligent operation of a lighthouse.[17]

> The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act.

*See also Rayonier, Inc. v. United States,* 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957) (United States might be held liable for negligent firefighting by Forest Service em-

---

**16.** The language of § 2680(h) does not, however, exclude liability when the arrest is merely instigated but not executed by the federal law enforcement officer. Liability for false arrest or false imprisonment has not been excluded merely because the instigator never laid hands on the victim. *Jillson v. Caprio,* 86 U.S.App. D.C. 168, 169, 181 F.2d 523, 524 (D.C.Cir. 1950); *Chesapeake & Potomac Telephone Co. v. Lewis,* 69 App.D.C. 191, 192, 99 F.2d 424, 425 (D.C.Cir. 1938); *Bright v. Patton,* 16 D.C. 534, 546 (1887). *See Alvey v. United Airlines,*

161 U.S.App.D.C. 112, 114, 494 F.2d 1031, 1033 (D.C.Cir. 1974); W. Prosser, Handbook of the Law of Torts, § 11, 47 (4th ed. 1971); Restatement (Second) of Torts §§ 35, 37 (1965).

**17.** The dispute, however, did not concern the discretionary function exception but rather whether an exception for "uniquely governmental" activities should be read into the FTCA. The uniquely governmental activities exception was rejected.

ployees). *See generally* Reynolds, *The Discretionary Function Exception of the Federal Tort Claims Act,* 57 Geo.L.J. 81 (1968).[18] In our own circuit application of the planning-operational test has resulted in decisions holding the United States liable where it negligently denied a medical certificate to an eligible pilot, *Duncan v. United States,* 355 F.Supp. 1167, 1170 (D.D.C. 1973),[19] but immune for allegedly negligent implementation of a riot control plan, *Monarch Ins. Co. of Ohio v. District of Columbia,* 353 F.Supp. 1249, 1256–59 (D.D.C.1973), *aff'd mem.,* 162 U.S.App.D.C. 96, 98, 497 F.2d 683–85, *cert. denied,* 419 U.S. 1021, 95 S.Ct. 497, 42 L.Ed.2d 295 (1974) ("Policy considerations directly related to objectives which are, in the strictest sense of the term, governmental or political pervade every phase of planning and executing a riot control program," 353 F.Supp. at 1258), and immune for an administrator's decision not to distribute to federally funded clinics promulgated guidelines concerning sterilization, *Relf v. United States,* 433 F.Supp. 423 (D.D.C.1977), *aff'd mem.,* 593 F.2d 1371 (1979).

The multitude of cases applying the exception to a variety of fact situations are conveniently catalogued in *Blessing v. United States,* 447 F.Supp. 1160 (E.D.Pa.1978). Although the cases create more of a "patchwork quilt" than a "seamless web," *id.* at 1167, there are persistent themes, *e. g.,* holding the government responsible for any negligent execution of admittedly discretionary policy judgments where the decisions required for the execution did not themselves involve the balancing of public policy factors. *Id.* at 1179–80 n.28. Cases construing the exception in the law enforce-

ment context have held it to exempt NLRB delay due to shortage of personnel in filing specification of back pay in connection with reinstatement order, *J. H. Rutter Rex Mfg. Co. v. United States,* 515 F.2d 97, 99 (5th Cir. 1975), *cert. denied,* 424 U.S. 954, 96 S.Ct. 1428, 47 L.Ed.2d 359 (1976); failure of U. S. Attorney to prosecute a wrongdoer, *Smith v. United States,* 375 F.2d 243 (5th Cir.), *cert. denied,* 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967); a State Department official's advice to Puerto Rican officials that the United States did not object to the release to Venezuelan officials of a privately owned plane, *Four Star Aviation v. United States,* 409 F.2d 292 (5th Cir. 1969); and management of a crowd and surrounding campus population during the integration of a southern university, *United States v. Faneca,* 332 F.2d 872 (5th Cir. 1964), *cert. denied,* 380 U.S. 971, 85 S.Ct. 1327, 14 L.Ed.2d 268 (1965). On the other hand, the exception has been rejected as applied to an FBI agent's on-the-spot decision to fire at a hijacked plane, *Downs v. United States,* 522 F.2d 990 (6th Cir. 1975); and failure to provide police protection to an endangered informant, *Swanner v. United States,* 309 F.Supp. 1183 (M.D.Ala.1970).

The *Blessing* court concluded from its survey of the field that the policy of the exception was to "prevent[ ] tort actions from becoming a vehicle for judicial interference with decisionmaking that is properly exercised by other branches of the government," and that the exception exempts the United States from liability only where "the question is not negligence but social wisdom, not due care but political practicability, not reasonableness but eco-

---

**18.** *See also Swanson v. United States,* 229 F.Supp. 217, 219–20 (N.D.Cal.1964) (government liable for air crash resulting from failure to supervise design and installation of aircraft elevator mechanism):

> In a strict sense, every action of a government employee, except perhaps a conditioned reflex action, involves the use of some degree of discretion. The planning level notion refers to decisions involving questions of policy, that is, the evaluation of factors such as the financial, political, economic, and social effects of a given plan or policy. . . .

> The operations level decision, on the other hand, involves decisions relating to the normal day-to-day operations of the government. Decisions made at this level may involve the exercise of discretion but not the evaluation of policy factors.

**19.** It is noteworthy that the *Duncan* case decided the United States could be held liable for the negligent performance of a discretionary function even when the injured party was not one for whose especial benefit the "discretionary function" was undertaken.

nomic expediency. Tort law simply furnishes an inadequate crucible for testing the merits of social, political, or economic decisions." *Id.* at 1170.

On the present record there is no clear indication that the decisions by *this* USNCB official concerning the nature of the information transmitted abroad, including the status of an extradition request, were essentially "political," "social" or "economic" or necessarily involved any policy-making function at all. Indeed the scope of the USNCB official's discretion is disputed on this record;[20] it is of course partly a question of law but also partly a question of fact, on which we do not feel the evidence is sufficiently undisputed for us to make the initial decision here. *See Carter v. Carlson,* 144 U.S.App.D.C. 388, 394, 447 F.2d 358, 364 (D.C.Cir. 1971), *rev'd on other grounds sub nom., District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973); *David v. Cohen,* 132 U.S.App.D.C. 333, 336, 407 F.2d 1268, 1271 (D.C.Cir. 1969). In short, whether the acts for which liability is here claimed were so fraught with foreign relations or other public policy considerations as to render them "discretionary" within the meaning of the FTCA cannot be summarily determined on this record.

Our conclusion that there is no clear out for the government on this record under the "discretionary exception" is bolstered by some uncertainty as to whether in enacting the law enforcement proviso to the § 2680(h) exception Congress meant to preserve the discretionary exception at all[21] for those enumerated torts contained in the

**20.** For example, Sims testified at his deposition as follows:

> Q Prior to June 3, 1975, what was the authority or the source of authority that you felt Interpol had to request arrest pending extradition?
> A Interpol in effect did not request arrest. Interpol's function and mission then and now is to act as a connecting link, the communications link between law enforcement agencies in this country and those abroad. Interpol was merely forwarding the request of the State's Attorney in Broward County, Florida, to the German police. This was the case then.

Deposition at 14. The Comptroller General's report painted a somewhat different picture of Interpol's role:

> Interpol has a two-fold role in extradition matters. *In some cases,* Interpol channels can be used to request foreign police to make a provisional arrest. A message from the U. S. Central Bureau to the French Central Bureau, for example, could be an acceptable basis for the provisional arrest of a person wanted in the United States. Interpol also circulates arrest requests. Upon receipt of certain information from the requesting bureau, the General Secretariat sends out a "red-index wanted notice" to all member bureaus. When a police department locates the wanted person, it complies with the provisions of the Interpol notice; i. e., arrest the subject, report location, keep watch on movements, etc. In any event, the receiving country acts in accordance with its own laws and treaties.

Comptroller General's Report 11 (emphasis supplied).

Although the *1976 Senate Appropriations Hearings, supra,* dwelt primarily on the request for and transmission of background information concerning individuals, Interpol representatives (including Sims) emphasized to the subcommittee again and again that USNCB acts as a *screen* for requests. *Id.* at 200 (Kenneth Grannoules, former Chief, USNCB, assuring Senator Montoya that USNCB tried to satisfy itself that foreign requests for information were for bona fide criminal investigations and not, in the words of the Senator's question "to serve the needs of an individual who might have requested it who was not within the circle of eligibility"); *id.* at 204 (Sims, assuring Senator Montoya he would not act on a request from abroad supported only by a vaguely stated suspicion); *id.* at 209, 210, 213.

**21.** The 1974 proviso has received comparatively little interpretation. *Hernandez v. Lattimore,* 612 F.2d 61 (2d Cir. 1979), decided that the existence of an FTCA remedy for assault by a federal officer did not preclude a *Bivens* claim against the officer individually. *Norton v. United States,* 581 F.2d 390 (4th Cir.), *cert. denied,* 439 U.S. 1003, 99 S.Ct. 613 (1978), decided that the good faith defense did apply to constitutional tort claims under the Act. (*Norton* is criticized in 47 Geo.Wash.L.Rev. 651 (1979).) *Black v. Sheraton Corp.,* 564 F.2d 531 (D.C.Cir. 1977), in our circuit, held that Congress has not ruled out by implication, either in the original enactment or in passing the 1974 proviso, recovery for invasion of privacy by FBI agents. *Daniels v. United States,* 470 F.Supp. 64 (E.D.N.C.1979), decided that only law enforcement torts committed in the scope of employment qualified for purposes of the Act.

proviso. *See* discussion in Boger, Gitenstein & Verkuil, *The Federal Tort Claims Act Intentional Torts Amendment: An Interpretative Analysis,* 54 N.C.L.Rev. 497, 525–32 (1976).

Neither the amendment nor the Senate report is explicit as to the applicability of § 2680(a) to § 2680(h). The amendment, speaking as it does of assault, battery, false imprisonment, false arrest, abuse of process and malicious prosecution, surely envisioned at a minimum an interpretation of § 2680(a) that would not immunize the wrongful or negligent carrying out of initial decisions to search, arrest, detain, prosecute or utilize legal process. For example, the language of the proviso would not support an exemption for reckless destruction of property perpetrated in the course of an otherwise legal search.

The 1974 proviso to § 2680(h) represents a substantial expansion of the United States' liability for the torts of its employees. But even more substantial expansions may soon be enacted. The Executive and the Congress appear to be moving in the direction of holding the government financially liable for all torts of its employees, rather than requiring those employees to undergo the financial risks and personal trauma of extended lawsuits for acts committed in the course of their duties which harm or injure innocent citizens.[22]

This record does not support the grant of summary judgment to the United States on the grounds either of the inapplicability of the § 2680(h) proviso or of the applicability of the § 2680(a) or § 2680(k) exemptions. We therefore vacate the judgment of the district court and remand for further proceedings. In so doing, we do not suggest that the district court may not upon appropriate findings make its own initial ruling on the applicability of the "discretionary function" and "intentional tort" exceptions, 28 U.S.C. §§ 2680(a) & 2680(h) (1976).

## IV. CLAIMS AGAINST THE INDIVIDUAL DEFENDANT

Finally, we come to the liability of the individual defendant, Sims, Chief of the USNCB and the primary actor in the drama. He was sued by the plaintiff for libel, slander, false arrest and imprisonment, and deprivation of fourth and fifth amendment constitutional rights.

### A. *The Defamation Claims*

In *Expeditions Unlimited Aquatic Enterprises v. Smithsonian Institution,* 184 U.S.App.D.C. 397, 566 F.2d 289 (D.C.Cir. 1977) (*en banc*), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978), we held that a government employee has an absolute immunity for common law defamation if he acts "within the ambit of his discretion."[23] The court below read this aspect of *Expeditions Unlimited* to survive the Supreme Court's ruling in *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), that only a qualified immunity attaches to an individual government employee who commits a constitutional tort. The district court found that Sims' acts were committed within the scope of his non-ministerial authority to transmit criminal information to foreign police departments and so absolute immunity is available. We agree and we affirm the dismissal of the defamation claims.

As noted above, note 23, and discussed below at greater length, the common law doctrine of official immunity, as announced in *Barr v. Mateo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959) (plurality), distinguishes between the performance of discretionary and ministerial functions and im-

---

**22.** In the past two Congresses, the administration has advocated proposals to make the United States exclusively liable for almost all constitutional and other torts committed by its employees. *See* H.R. 9219, 95th Cong., 1st Sess. (1977); H.R. 2659, 96th Cong., 1st Sess. (1979); S. 695, 96th Cong., 1st Sess. (1979).

**23.** The phrase "within the ambit of his discretion" conflates two separate requirements for immunity under *Barr v. Mateo,* 360 U.S. 564, 575, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959) (plurality); first, that the act be within the outer perimeter of a government employee's authority and second, that the act be discretionary. *See Bivens,* on remand, *infra.*

munity is conferred only for the former. Although the discretion of law enforcement officers is traditionally read narrowly when the officers are sued for false arrest (see discussion *ante*), it is not so restricted in suits for defamation. *Cf. Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Expeditions Unlimited, supra*, 566 F.2d at 294.

### B. False Arrest, False Imprisonment and Constitutional Claims

#### 1. The District Court's Basis for Dismissal

The claims of constitutional violation, false arrest and false imprisonment present a harder case. At first, the district court refused to dismiss them because the disputed evidence did not show that the German arrest would not have occurred except for the alleged misrepresentations of fact by Sims, and because of conflicting evidence about whether the misrepresentations were committed in good faith. Subsequently, the defendants produced an affidavit from the First Prosecutor in Wiesbaden which stated as to his decision three years earlier to arrest plaintiff:

> The measures which I initiated were based on the facts communicated to me by the American authorities, in particular, on the arrest warrant issued by the Circuit Court, 17th Judicial District, BROWARD County, Florida.

J.A. 435.

The court found the affidavit dispositive; the "record establishes beyond dispute that the West German authorities based their

decision to arrest plaintiff not on the statement that the United States would seek extradition but rather on the Florida felony warrants and the representations by Interpol Washington that Florida authorities could be expected to seek extradition through diplomatic channels." [24] On that basis, it dismissed the constitutional claims and false arrest and false imprisonment claims against Sims.

To uphold the dismissal on the basis of the German prosecutor's affidavit would require this court to find that the record is bare of any evidence disputing defendant's assertion that the German arrest and detention resulted solely from the first communication, which recounted the Florida warrants and requested provisional arrest on their account. We are not able to do so.

First, the affidavit itself says that the action was taken on the "facts communicated to me by the American authorities. In particular, on the arrest warrant issued by the Circuit Court, 17th Judicial District, BROWARD County, Florida . . . ." This affidavit is certainly open to plaintiff's interpretation that the arrest was based not on one but on all of the half dozen or so communications that were sent to the Wiesbaden Interpol bureau prior to the arrest, two of which contained the allegedly erroneous material about the United States' intention to extradite and one of which mischaracterized the status of the Maryland warrant.

The German Interpol policy statement on provisional arrests clearly requires as part of any document requesting arrest from

---

**24.** An earlier affidavit had been disregarded by the district court because it evidenced no personal knowledge of the basis for the arrest. The affidavit had stated as follows:

> Mohammad SAMI was arrested on 14th May 1975 on the warrant of arrest issued in Florida and the Interpol Washington message No. 40067 of 12th May 1975 indicating that the appropriate authority of the federal republic of Germany could expect that the Florida authorities would request Mohammad SAMI's extradition in accordance to german-american treaty on extradition. Said person was not arrested on the basis of the warrant issued in Maryland because insofar a promise

of extradition had not been made. For an arrest to be made in the federal republic of Germany for an arrest warrant issued in the United States, it is on principle quite sufficient that the appropriate authority of the federal republic of Germany is of the opinion that the german-american treaty on extradition of 1930 offers a basis for an extradition as a result of such violation and that the federal republic of Germany can expect the appropriate authorities of the United States will make a request for extradition.

> J.A. 262–63. The second affidavit on which the court relied incorporated the first one by reference.

that country's bureau "assurances that extradition will be requested." Sims himself testified that the purpose of his transmitting information to Wiesbaden about the Maryland warrant was to "get across that the Florida warrant was still active." J.A. 559. Following plaintiff's arrest the German authorities themselves repeatedly urged prompt forwarding of the normal extradition request, suggesting that they were relying on prior assurances that the extradition request would be forthcoming.

Finally, even if the affidavit were sufficient to dispel any doubts about the basis for the arrest, it could not support the burden that the subsequent detention—4 days—was similarly based. The continued detention seems to have been based on the German authorities' belief that extradition was imminent. According to plaintiff's uncontradicted sworn statement the German Magistrate who passed on the detention said he had no choice but to detain the plaintiff because "the request for provisional arrest was in the name of the United States Government."

We cannot, therefore, agree with the district court that there are no genuine issues as to any material fact concerning the causal relationship between Sims' misrepresentations and plaintiff's detention abroad. However, we find independent bases for affirmance of the district court's dismissal of claims against Sims.

### 2. The False Arrest and Imprisonment Claims

Although police officers are traditionally granted only a restrictive immunity against claims for false arrest and imprisonment, see *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 456 F.2d 1339, 1346 (2d Cir. 1972) (on remand) and *Carter v. Carlson, supra,* 447 F.2d at 362–63, this is not an ordinary false arrest case. To explain why some background in the doctrine of official immunity is necessary.

25. *See* note 23, *supra.* We perceive no argument here that Sims' actions were not within the outer perimeter of his authority. Indeed defendants below expressly "agree[d] that at all times defendant Sims and Holmes acted

Before *Economou* the general rule, to which the false arrest and imprisonment cases are something of an exception, was that officials are accorded an absolute immunity commensurate with the scope of discretion with which they are vested.[25] As applied recently, the rule derives primarily from *Barr v. Mateo, supra* :

[T]he occasions upon which the acts of the head of an executive department will be protected by the privilege are doubtless far broader than in the case of an officer with less sweeping functions. But that is because the higher the post, the broader the range of responsibilities and duties, and the wider the scope of discretion, it entails. It is not the title of his office but the duties with which the particular officer sought to be made to respond in damages is entrusted—the relation of the act complained of to "matters committed by law to his control or supervision," *Spalding v. Vilas,* [161 U.S. 483, 16 S.Ct. 631, 637, 40 L.Ed. 780] at 498 [1896]—which must provide the guide in delineating the scope of the rule which clothes the official acts of the executive officer with immunity from civil defamation suits.

360 U.S. at 573–74, 79 S.Ct. at 1340–41.

We agree with the district court that the doctrine of absolute immunity from common law torts survives *Economou. See Miller v. DeLaune,* 602 F.2d 198, 200 (9th Cir. 1979); *Granger v. Marek,* 583 F.2d 781, 784 (6th Cir. 1978); *Evans v. Wright,* 582 F.2d 20, 21 (5th Cir. 1978). *See also Birnbaum v. United States,* 588 F.2d 319, 332 (2d Cir. 1978); *Tigue v. Swaim,* 585 F.2d 909, 913 (8th Cir. 1978); *Economou v. Butz,* 466 F.Supp. 1351, 1355–56 (S.D.N.Y.1979) (on remand). *Ferri v. Ackerman,* —— U.S. ——, 100 S.Ct. 402, 62 L.Ed.2d 355 (1979) (holding federal law of official immunity not applicable to Criminal Justice Act attor-

within the scope of their employment by the United States." J.A. 352. Accordingly, we do not discuss this aspect of the doctrine of official immunity.

ney sued for malpractice), decided after this case was argued, does not suggest a contrary conclusion. Indeed, the opinion assumes the continuing vitality of the doctrine. *Id.* at —— & n.20, 100 S.Ct. 402 & n.20.

Under the *Barr* doctrine, performance of "discretionary duties" did not create liability for common law torts. But the analytical process by which a conclusion was reached that an act was discretionary or non-discretionary for common-law purposes was no less confusing than that process was for purposes of the discretionary function exception to the FTCA. *See, e. g., Johnson v. Alldredge,* 488 F.2d 820 (3d Cir. 1973), *cert. denied,* 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974) (destruction of plaintiff's legal materials taken from another inmate's prison cell held ministerial; issuance of prison regulations governing such destruction held discretionary); *David v. Cohen, supra,* 132 U.S.App.D.C. at 337, 407 F.2d at 1272 (decision to issue tax levy when taxes already paid held discretionary). *See generally Carter v. Carlson, supra,* 447 F.2d at 361–63 (criticizing focus on the word "discretionary" in the common-law doctrine of official immunity); *Johnson v. California,* 69 Cal.2d 782, 788, 73 Cal.Rptr. 240, 246, 447 P.2d 352, 357 (1968) (same). Almost any wrong can be characterized as discretionary or non-discretionary for purposes of exemption from liability under either the FTCA or the common law. We have already concluded, based on the facts presented by this record that Sims' acts here were not clearly discretionary (and thus not clearly exempt) under the FTCA.[26] However, the peculiar combination of facts of this case compels a different conclusion for purposes of official immunity from the false arrest and imprisonment claims as well as from the defamation claims.[27] We think there is enough play in the joints of the doctrine of official immunity to permit a distinction on the basis of "discretion" between personal and sovereign liability on the facts of this case.

The concepts of "discretion" in the FTCA and in the doctrine of official immunity are similar. Their origins may have been in a unitary doctrine. *See Coates v. United States,* 181 F.2d 816 (8th Cir. 1950); Comment, *The Federal Tort Claims Act,* 56 Yale L.J. 534, 545 (1947). However, the question whether an official should be personally liable for his or her acts which cause injury and the question whether the United States should compensate for those injuries address somewhat different concerns and need not, as an original matter, have been answered in the same way. *See* 2 F. Harper & F. James, The Law of Torts, § 29.14, 1658–59 (1956) (suggesting this).[28]

Compensation is the primary concern addressed by the FTCA. Compensation and deterrence are the twin functions performed by the imposition of personal liabili-

---

**26.** See discussion *supra.*

**27.** Our decision in *Apton v. Wilson,* 165 U.S. App.D.C. 22, 506 F.2d 83 (D.C.Cir. 1974), bestowing only a qualified immunity on Justice Department officials who participated in planning the arrests of the Mayday demonstrators, is distinguishable since it relates only to immunity for constitutional violations. There the defendants were accused of consciously planning mass arrests of innocent bystanders as well as demonstrators at key points in the city. Normal field arrest and post-arrest procedures were suspended. The issue we decided there was whether "high officials of the Justice Department enjoy absolute immunity from liability for directing or participating in law enforcement activity that deprives innocent citizens of Fourth and Fifth Amendment rights." *Id.* 165 U.S.App.D.C. at 29, 506 F.2d at 90.

**28.** There has been some suggestion that the exception [the discretionary function exception, 28 U.S.C. 2680(a) (1976)] should be interpreted in the light of the law which has developed to protect individual officers from compulsory process or from liability for damages. The word "discretionary" is used in both these contexts also, but . . . these problems involve . . . some [policy reasons for immunity] that are not present where compensation by government is in question rather than the holding up of governmental action, or the personal liability of an officer. The mechanical use of such precedents is therefore likely to restrict liability unduly.

*Id.* at 1658 (footnotes omitted).

ty on federal officers.[29] As a practical matter, however, it is recognized that the promise of compensation through pursuit of an official is small comfort to the injured individual.[30] Few officials' assets can withstand a judgment worth pursuing through litigation. The assertion of individual liability only minimally serves a compensatory function.

Most importantly the cases, commentators and policymakers have expressly acknowledged that official and sovereign liability need not and perhaps should not be coextensive. *E. g., Butz v. Economou, supra,* 438 U.S. at 504–05, 98 S.Ct. 2894; Bell, *Proposed Amendments to the Federal Tort Claims Act,* 16 Harv.J.Legis. 1 (1979) (discussing proposal to broaden sovereign liability and to immunize federal officials); Engdahl, *Immunity and Accountability for Positive Governmental Wrongs,* 44 U.Colo.L. Rev. 1, 47 (1972) (noting the inverse relationship, historically, between the doctrines of sovereign and official immunity and arguing that the expansion of sovereign immunity was predicated on an understanding that officials were to be liable personally for their wrongs). Personal liability may be warranted where the sovereign remains immune and may not be required where the sovereign is liable. When the sovereign has waived its immunity the compensatory function of imposing personal liability is preempted and unnecessary.

As already noted, personal liability also serves a deterrent function. In fact, we think the traditionally narrower immunity accorded low-level law enforcement officers

in actions for false arrest and false imprisonment was developed in recognition of the need to fulfill this deterrent function when an abuse of authority may encroach on personal liberty.[31] The especial need for deterrence from wrongful arrests appeared to distinguish "discretion" for purposes of immunity for defamation from "discretion" for purposes of immunity for false arrest. However, although the question is difficult, we do not think the function of deterrence well-served by holding the defendant Sims not immune from the common law claims of false arrest and imprisonment asserted in this case.

The individual defendant here, Sims, was the chief of USNCB, with at least some responsibility for deciding when and what kind of information to relay to foreign governments about fugitives or suspected criminals and whether to request the cooperation of those foreign governments in arresting or detaining American citizens or residents abroad.[32] Moreover, the arrest here involved a highly attenuated route between Sims' transmittals and the plaintiff's arrest and detention, a route which, as the district court pointed out, featured other independent decision-makers along the way. We note also that this is not the typical case of arrest without "probable cause" (at least in the traditional sense)[33] or in violation of clearly defined procedures. No written guidelines about whom to contact before requesting provisional arrests apparently existed until after this unfortunate incident, and there was very little evidence to

**29.** *See Butz v. Economou, supra,* 438 U.S. at 505, 98 S.Ct. at 2910: "If, as the Government argues, all officials exercising discretion were exempt from personal liability, a suit under the Constitution could provide no redress to the injured citizen, nor would it in any degree deter federal officials from committing . . . wrongs."

**30.** The Senate Report to the bill which added the law enforcement proviso to 28 U.S.C. § 2680(h) noted: "In the case of *Bivens* . . the Supreme Court held that the Fourth Amendment and elementary justice require that there be a right of action against the federal agents for illegal searches conducted in bad faith or without probable cause. Of course,

federal agents are usually judgment proof so this is a rather hollow remedy." S.Rep. No. 588, 93d Cong., 1st Sess. 3 (1973).

**31.** The underlying value in the preservation of personal liberty is constitutional in stature, *see Apton v. Wilson, supra,* 165 U.S.App.D.C. at 32, 506 F.2d at 93, but, as discussed below, not every wrongful arrest amounts to a constitutional violation.

**32.** As noted above, *supra,* note 20, however, the precise nature of the "discretion" with which Sims was vested is disputed.

**33.** See discussion, *infra,* text at notes 34–37.

suggest that provisional arrest requests had previously been privately initiated, as was the case here.

Finally, the probability of this incident's repetition has been substantially diminished by the adoption, almost immediately after these events, of new guidelines under which the State Department will monitor more closely USNCB activities. It is in this narrow context that we apply the *Barr* rule of absolute immunity and hold Sims immune from the false arrest and false imprisonment claims, as well as from the defamation claims.

### 3. *The Constitutional Claims*

After careful review, we find that even under the most favorable view of the facts here, no actionable claims of constitutional proportions are presented.[34]

Plaintiff does not urge a deprivation of any specific substantive right. He does not argue, at least in the traditional sense, that there was no probable cause for his arrest. Plaintiff argued instead that there was no probable cause that an *extraditable* offense was committed, relying primarily on *United States v. Rauscher*, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886). This argument confuses the substantive protections of the fourth amendment with more general due process concerns or specific procedural protections embodied in an extradition treaty or statutory provision.

We cannot, on this record, agree with the suggestions implicit in plaintiff's argument that the fourth amendment necessarily prohibits arrests which are on probable cause but which may not be extraditable under the applicable treaty.

Erroneous or wrongful loss of liberty does not *ipso facto* amount to a constitutional violation. Several cases under 42 U.S.C. § 1983 (1976) have held that it takes more than a false arrest or malicious prosecution claim to rise to the dignity of a constitutional violation, despite the loss of liberty that may be involved.

The Supreme Court addressed the issue recently in *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), and concluded under the facts of that case that a mistaken arrest and imprisonment for a period of eight days pursuant to a valid warrant did not amount to a constitutional deprivation. *Id.* at 145, 99 S.Ct. 2689. Mr. Justice Blackmun, concurring, suggested that a different analysis might have been appropriate if there were anything in the sheriff's conduct there alleged which "shock[ed] the conscience" or was "otherwise offensive to the 'concept of ordered liberty'." *Id.* at 147, 99 S.Ct. at 2696, *quoting Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937).

In cases which antedate *McCollan*, the pervasiveness or regularity of the officials' behavior and the need for federal (here judicial) supervision all seem to have been factored into the decision whether a genuine constitutional violation has taken place. *See, e. g., Atkins v. Lanning*, 556 F.2d 485, 489 (10th Cir. 1977), *aff'g* 415 F.Supp. 186 (N.D.Okl.1976) (careless or negligent furnishing of erroneous information to prosecutor resulting in official charges held not actionable) ("[s]imply because under state common law the slightest interference with personal liberty might constitute a false imprisonment, it does not follow that all

34. The extent to which the Constitution's protections shield citizens, resident-aliens or aliens from actions which occur in other countries is not clear. *See, e. g., Holmes v. Laird*, 148 U.S.App.D.C. 187, 459 F.2d 1211 (D.C.Cir.), *cert. denied*, 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972); *Powell v. Zuckert*, 125 U.S.App.D.C. 55, 366 F.2d 634 (D.C.Cir. 1966); *Birdsell v. United States*, 346 F.2d 775 (5th Cir.), *cert. denied*, 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366 (1965); *Berlin Democratic Club v. Rumsfeld*, 410 F.Supp. 144 (D.D.C.1976). Much may depend on the status of both the

individual complaining and the actor complained of. The strongest case appears to be where the complaining individual is a United States citizen and the actor complained of a United States official or agency. Assuming, *arguendo*, plaintiff here is not deprived of the Constitution's protections merely because Sims' transmissions crossed the Atlantic instead of the Potomac and because the arresting officers answer to their own government and not to ours, we still think that plaintiff states no actionable constitutional claim.

such invasions, however trivial or frivolous, serve to activate remedies under the due process clause of the Fourteenth Amendment"); *Curtis v. Rosso & Mastracco*, 413 F.Supp. 804 (E.D.Va.1976) (malicious prosecution claim by itself not enough to invoke § 1983). In *Taylor v. Nichols*, 409 F.Supp. 927 (D.Kan.1976), *aff'd*, 558 F.2d 561 (10th Cir. 1977), the court announced, in dismissing a § 1983 action based on malicious prosecution:

[I]n resolving whether a particular right asserted by a plaintiff does fall within the protective ambit of the Civil Rights Act, federal courts are guided by the following factors regarding the proper balance between the respective roles of the state and federal governments in the enforcement of state laws:

"In addition to being alert for possible abusive use of the Civil Rights Acts, the federal courts should also consider the need for federal supervision of the type of official conduct involved. Where the States have reasonably effective safeguards or remedies, a restrictive reading of the Acts is called for. The theory of the action should also be considered in deciding how strictly to construe the Acts. If the theory is merely one of tort then the Acts should be construed strictly but if the theory is to alter official conduct, a more liberal construction may be called for. If the action is for individual redress, then the Acts should be construed more strictly than in a broad class action which would be more in keeping with the philosophy of the Acts."

409 F.Supp. at 933, *quoting Egan v. City of Aurora*, 174 F.Supp. 794, 800 (N.D.Ill.1959).

■ Comparable criteria should guide us in deciding whether a valid constitutional claim has been alleged here, where there was ample probable cause for a domestic arrest. We are satisfied that no claim of substantive constitutional deprivation has been made out with respect to Sims' actions in forwarding erroneous information about Sami's legal status to the foreign Interpol office.

■ Neither does plaintiff allege any cognizable deprivation of a procedural right protected by the Constitution. The Constitution's extradition provision, U.S.Const. art. IV, § 2, cl. 2, applies only to interstate extradition,[35] not international extradition. Moreover, the traditional reading of the constitutional provision has been that it confers no rights on the individual being sought. *See Biddinger v. Commissioner of Police*, 245 U.S. 128, 38 S.Ct. 41, 62 L.Ed. 193 (1917).

We have carefully considered the cases where improper extradition was claimed as the basis for a § 1983 action.[36] What we glean from our review is that Sami does not have a cognizable constitutional claim based on any violation of the German-American Extradition Treaty. There was no shocking behavior characterized by abduction or brutality which would support an actionable constitutional claim.[37]

\* \* \* \* \* \*

**35.** Domestic extradition is more correctly referred to as "rendition." See Note, *Interstate Rendition and the Fourth Amendment*, 24 Rutgers L.Rev. 551 (1970).

**36.** *McBride v. Soos*, 594 F.2d 610 (7th Cir. 1979); *Wirth v. Surles*, 562 F.2d 319 (4th Cir. 1977), *cert. denied*, 435 U.S. 933, 98 S.Ct. 1509, 55 L.Ed.2d 531 (1978); *Sanders v. Conine*, 506 F.2d 530 (10th Cir. 1974); *Picking v. Pennsylvania R.R. Co.*, 151 F.2d 240 (3d Cir. 1945); *Adams v. Cuyler*, 441 F.Supp. 556 (E.D.Pa. 1977), *vacated*, 592 F.2d 720 (3d Cir. 1979); *Raffone v. Sullivan*, 436 F.Supp. 939 (D.Conn. 1977); *U. S. ex rel. Bryant v. Shapp*, 423 F.Supp. 471 (D.Del.1976); *Pierson v. Grant*, 357 F.Supp. 397 (N.D.Iowa 1973); *Johnson v. Buie*, 312 F.Supp. 1349 (W.D.Mo.1970); *Brzozowski v. Randall*, 281 F.Supp. 306 (E.D.Pa.1968); *Crawford v. Lydick*, 179 F.Supp. 211 (W.D. Mich.1959), *aff'd per curiam*, 280 F.2d 426 (6th Cir.), *cert. denied*, 364 U.S. 849, 81 S.Ct. 93, 5 L.Ed.2d 72 (1960).

**37.** *See Raffone v. Sullivan, supra*, note 36, *applying United States v. Toscanino*, 500 F.2d 267, *rehearing en banc denied*, 504 F.2d 1380 (2d Cir. 1974) (Mulligan and Timbers, JJ., dissenting from denial of rehearing); *United States ex rel. Lujan v. Gengler*, 510 F.2d 62 (2d Cir. 1974), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975).

The judgments dismissing the action against Interpol and defendant Sims are affirmed. The dismissal of the action against the United States is reversed and remanded for further proceedings consistent with this opinion.

*It is so ordered.*