Renate KLINE, et al., Plaintiffs,

v.

The **REPUBLIC OF EL SALVADOR**, et al., Defendants.

No. 83–2917.

United States District Court, District of Columbia.

March 12, 1985.

As Amended March 14, 1985.

William E. Genego, University of S. Cal.
Law Center, Mark D. Rosenbaum, ACLU
Foundation of S. Cal. Los Angeles, Cal.,

Leonard I. Weinglass, New York City, Arthur B. Spitzer, Elizabeth Symonds, American Civil Liberties Union Fund of the Nat. Capitol Area, Washington, D.C., for plaintiffs.

Stuart H. Newberger, Asst. U.S. Atty., Washington, D.C., for Federal defendants.

## OPINION

HAROLD H. GREENE, District Judge.

This case arises out of the circumstances surrounding the death of Michael Kline, an American citizen, while travelling in El Salvador in October 1982. According to the complaint, Kline was beaten and killed by El Salvadorean soldiers. It is further claimed that the government of El Salvador did not investigate the killing or prosecute the responsible individuals and instead attempted to cover up and distort the true cause of death. In addition, the complaint alleges that United States government agencies and certain named officials attempted also to cover up the circumstances of Michael Kline's death, obstructed the plaintiffs [1] in their attempt to obtain information and refused to undertake an investigation of the relevant events.

The complaint contains four counts. Count One is directed against the government of the Republic of El Salvador, claiming that its agents beat, tortured, and executed Michael Kline; that they blocked any meaningful investigation or prosecution, and that these actions caused severe emotional distress to members of Mr. Kline's family in the United States. Counts Two through Four, which are brought against various United States agencies and officials, allege the commission of common law and constitutional torts. Presently before the Court are two motions to dismiss—that

1. Renate Kline is Michael Kline's mother; Julie-Anne Kline is his sister.

2. 28 U.S.C. §§ 1330, 1332(a), 1391(f), 1441(d), 1602–1611.

3. 28 U.S.C. § 1605(a)(5).

4. See H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 21 (1976); S.Rep. No. 94–1310, 94th Cong.,

of El Salvador and that of the United States.

## I

### El Salvador

In Count I of the complaint, plaintiffs allege that actions taken by the government of El Salvador in that country relating to the death of Michael Kline constituted the tort of intentional infliction of emotional distress and that, since the distress occurred in the United States, the courts of this country have jurisdiction notwithstanding the fact that El Salvador is a foreign sovereign generally immune from suit. Under established law, there is no basis whatever for that contention.

█ The Foreign Sovereign Immunities Act (FSIA) [2] governs claims of immunity in civil actions brought in the courts of the United States against a foreign state. *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). Under the Act, a foreign state is immune from suit, and the court lacks jurisdiction, unless a specific statutory exception is found to be applicable. The exception claimed by plaintiffs to apply here provides that a foreign state is not immune where money damages are sought against it "for personal injury or death, or damage to property, *occurring in the United States* (emphasis added)." [3]

█ The language of the exception suggests, and the legislative history of the Act [4] as well as the decided cases make it entirely clear, that United States courts have jurisdiction under the terms of this statute only if the tort as well as the injury occurred in this country.[5]

2d Sess. 20 (1976), U.S.Code Cong. & Admin. News 1976, p. 6604.

5. Every case upholding jurisdiction under this exception involved a tort that occurred within the United States. See *Olsen by Sheldon v. Government of Mexico,* 729 F.2d 641 (9th Cir. 1984); *Letelier v. Republic of Chile,* 488 F.Supp. 665 (D.D.C.1980); *De Sanchez v. Banco Central de Nicaragua,* 515 F.Supp. 900 (E.D.La.1981).

In *Persinger v. Islamic Republic of Iran,* 729 F.2d 835 (D.C.Cir.1984), the parents of a United States Marine taken hostage at the American embassy in Iran sued for the mental and emotional distress they suffered in the United States as a consequence of their son's detention in Iran. The Court of Appeals flatly rejected their claim, holding that "both the tort and the injury must occur in the United States" for a court to have jurisdiction under the Act. 729 F.2d at 842. See also *Asociacion de Reclamantes v. United Mexican States,* 735 F.2d 1517 (D.C.Cir.1984); *McKeel v. Islamic Republic of Iran,* 722 F.2d 582, 589–90 n. 10 (9th Cir.1983); *Frolova v. Union of Soviet Socialist Republics,* 558 F.Supp. 358, 362 (N.D.Ill.1983); *Matter of Sedco, Inc.,* 543 F.Supp. 561, 567 (S.D.Tex. 1982). In the instant case, of course, the complaint itself alleges that the tort occurred in El Salvador, and under the precedents that nation is immune from suit in the courts of the United States.[6]

Wholly aside from precedent, it is clear that the construction argued by plaintiffs is inappropriate. If plaintiffs are correct, every alleged governmental tort occurring in any foreign country would be subject to review in the courts of the United States at the request of any member of the family of the victim who claimed to have suffered emotional distress here as a consequence of the foreign act. Such international judicial interference would be entirely unprecedented, and a court would not be justified in engaging in it unless congressional intent to grant jurisdiction therefor were manifestly plain. That, as indicated, is not true

here. The claim against the government of El Salvador will accordingly be dismissed.

## II

### *Official Capacity*

The complaint states three claims against the federal defendants:[7] (1) intentional infliction of emotional distress; (2) denial of First Amendment rights; and (3) denial of equal protection under the Fifth Amendment.

■ The federal government, its agencies, and federal officials when sued in their official capacities, are absolutely shielded from tort actions for damages unless sovereign immunity has been waived. *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976); *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980). The only waiver for common law torts conceivably applicable to the present situation is the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2679(a). However, the statute itself constitutes an insuperable obstacle to plaintiffs' claims insofar as they seek relief against the Department of State, the Federal Bureau of Investigation, and the various officers in their official capacities, for three reasons.

■ First, the Act directs that the exclusive remedy for common law tort claims is an action against the United States rather than against the individuals or the particular governmental agencies (28 U.S.C. § 2679). Since plaintiffs elected to sue the agencies and the officials rather than the government itself, the "official capacity"

---

6. Plaintiffs, recognizing the existence and the binding effect of these decisions, argue only that *"Persinger ...* was wrongly decided." Plaintiffs' Response at 2. That, obviously, is not a basis upon which this Court would be justified in ignoring precedent from its own Court of Appeals, even if it concluded, contrary to fact, that the statute and the legislative history pointed in that direction.

7. The federal defendants are George Shultz, in his individual capacity and in his official capacity as United States Secretary of State; the United States Department of State; Deane R. Hin-

ton, in his individual capacity and in his official capacity as United States Ambassador to El Salvador; Thomas Pickering, in his individual capacity and in his official capacity as an American Counsel in El Salvador; Thomas Pickering, in his individual capacity and in his official capacity as an American Counsel in El Salvador; Patricia Butenis, in her individual capacity and in her official capacity as American Vice consul in El Salvador; William Webster, in his individual capacity and in his official capacity as Director of the Federal Bureau of Investigation; and the Federal Bureau of Investigation.

aspect of their lawsuit must fail for that reason alone. Second, prior to instituting suit, the plaintiffs must exhaust certain administrative remedies (28 U.S.C. § 2675(a)). Plaintiffs have failed to comply with that requirement of the Act as well, and that defect, too, bars their suit. Third, the Federal Tort Claims Act does not waive sovereign immunity with respect to constitutional torts; accordingly, there is no applicable waiver of sovereign immunity for either the First Amendment or the Fifth Amendment claim. *Laswell v. Brown,* 683 F.2d 261, 267–68 (8th Cir.1982); *Birnbaum v. United States,* 588 F.2d 319, 327–28 (2d Cir.1978).

For these reasons, all of plaintiffs' claims against the agencies, as well as their claims against the individual officers to the extent that they are being pursued against them in their official capacities, must be dismissed. What remains to be discussed are the claims against the named officials in their individual capacities.

### III

### Common Law Tort

Count II of the complaint alleges that the federal defendants failed to investigate the causes and circumstances of Michael Kline's death and refused to provide information regarding that death, and it seeks damages from these defendants for the common law tort of infliction of emotional distress.

■ A federal official has absolute immunity from actions for common law torts he is claimed to have committed in his individual capacity provided that (1) these

actions were within the outer perimeter of his line of duty; and (2) they are related to a discretionary rather than a ministerial function. *Barr v. Mateo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); *Gray v. Bell,* 712 F.2d 490 (D.C.Cir.1983); *Sami v. United States,* 617 F.2d 755 (D.C.Cir.1979); *Expeditions Unlimited Aquatic Enterprises v. Smithsonian Institution,* 566 F.2d 289 (D.C.Cir.1977). Plaintiffs have not alleged that the activities here involved were beyond the limits of defendants' official duties, and any such claim would be without merit in any event, for these activities were directly related to defendants' positions as officials of the Department of State or of the Federal Bureau of Investigation. Thus, defendants are immune if they were engaged in discretionary functions when they committed the allegedly tortious acts.

■ A discretionary function has been defined as one in which a government official must determine what action to take based upon a case-by-case analysis of relevant factors and in which his decision includes elements of judgment and discretion. *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); *Gray v. Bell, supra; Beins v. United States,* 695 F.2d 591 (D.C.Cir.1982); *Sami v. United States, supra.*[8] In contrast, ministerial functions are acts or duties required by law in response to a specific state of facts without the exercise of individual judgment or discretion.[9]

In support of their claim that defendants were engaged only in exercising a ministerial duty, plaintiffs rely on a regulation codified in 22 C.F.R. § 72.4 which requires

---

**8.** Where public policy requires that a government official weigh competing interests, immunity from tort actions is necessary to ensure that he is not deterred from taking actions in the public interest by a concern over personal liability for the consequences of those actions. *Barr v. Mateo, supra.* Furthermore, such immunity "prevent[s] tort actions from becoming a vehicle for judicial interference with decisionmaking that is properly exercised by other branches of the government" *Sami v. United States, supra,* 617 F.2d at 766; *Blessing v. United States,* 447 F.Supp. 1160, 1170 (E.D.Pa.1978).

**9.** When faced with a ministerial duty, a government official must act in a prescribed manner; thus, concern over personal liability is not a factor in determining the official's actions—it is set by rule. Furthermore, judicial review of a ministerial function does not represent an intrusion on the policy-making branches of government, again because the performance of such functions is delineated by law, and a court need only determine whether or not a departure from the lawful standard occurred.

State Department officials to complete an administrative report "providing essential facts concerning the death of a United States citizen" abroad to his closest known relative. In their view, because that report is required by regulation, immunity is not available to the defendants.[10]

■■■ The regulation certainly imposes upon State Department officials the function of filing a notification of death report. They must prepare such a report whenever an American citizen dies in a foreign country; and such filing is plainly a ministerial duty. However, it does not at all follow either that the breadth and scope of the report are not substantially dictated by discretion or judgment, or that the filing of the form is the only permitted response to a citizen's death overseas. Depending upon circumstances and policy considerations, the Department of State may obviously take a variety of actions both with respect to the scope of the report and with respect to other measures. That is the essence of a discretionary function.

Indeed, plaintiffs implicitly recognize the element of discretion, for their complaint asserts that defendants should have done more to investigate the death of Michael Kline. There is nothing in the regulation to require Department of State officials to undertake actual investigations of the deaths of Americans abroad, let alone to dictate the scope of such investigations; to pressure the foreign state to conduct its own inquiry; to assist relatives attempting on their own to investigate the circumstances of death; or to disclose all information they may have relating to the death of an American abroad.

Yet it is the failure of the defendants to carry out these functions—nowhere mentioned in the regulation and discretionary to a substantial degree—that is the crux of

this lawsuit. In brief, whatever may be the ministerial character of the report required by section 72.4, the question of the scope of actions beyond the mere minimum of information that must be included in that report are matters of discretion. Failure of the defendants to exercise their discretion in the manner requested by plaintiffs is not a violation of the regulation, and defendants are therefore absolutely immune from common law tort suit with respect thereto.

## IV

### *First Amendment*

The complaint next alleges the commission of a constitutional tort based upon the First Amendment right to receive information. *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Here again, an analysis of immunity doctrines is required.

■■■ Executive branch officials "whose special functions or constitutional status requires complete protection from suit" have absolute immunity from constitutional torts. *Harlow v. Fitzgerald,* 457 U.S. 800, 807, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982). The government asserts that the defendants in this case are absolutely immune because they are engaged in "extremely sensitive duties directly related to the formulation and exercise of United States foreign policy."[11] However, the government has entirely failed to meet its burden of demonstrating that the functions here involved are so sensitive as to require such broad immunity (*Harlow v. Fitzgerald, supra,* at 812–13, 102 S.Ct. at 2735–36), and the claim to absolute immunity accordingly cannot be sustained.

Qualified immunity from suit is available to executive officials to the extent that, in

---

**10.** It further follows, according to plaintiffs, that defendants would also lack immunity if they performed discretionary actions beyond the scope of the described ministerial duties. *Blessing v. United States, supra,* 447 F.Supp. 1160, 1177 (E.D.Pa.1978); *Griffith v. United States,* 500 F.2d 1059 (3d Cir.1974). But these

cases merely hold that violation of a ministerial command takes what otherwise might be a discretionary function outside the scope the statutory exception for discretionary acts. See 500 F.2d at 1068–69.

**11.** Federal Defendants' Motion to Dismiss at 11.

the performance of discretionary functions, "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, supra,* 457 U.S. at 818, 102 S.Ct. at 2738. As noted above, the functions at issue here were discretionary in character, so that the determinative question on immunity is whether the conduct of the officials violated clearly established statutory or constitutional rights.

 The First Amendment does protect the right of citizens to receive information as well as to disseminate it,[12] and on this basis it prohibits government interference with the transmission of information from a willing speaker to a willing listener.[13] However, that constitutional provision has never been interpreted as affirmatively requiring the government either to collect and disseminate information or as requiring a government official who is an "unwilling speaker" to impart information. "Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control." *Houchins v. KQED, Inc.,* 438 U.S. 1, 15, 98 S.Ct. 2588, 2597, 57 L.Ed.2d 553 (1978) (Burger, C.J.).[14]

 Plaintiffs' arguments to the contrary notwithstanding, it is plain, therefore, at a minimum, that defendants' conduct does not constitute the violation of a *clearly established* constitutional right[15] of which a reasonable person would have known and for the violation of which he may therefore be required to pay damages.

On this basis, the defendants are likewise protected from suit with respect to the First Amendment claim.

## V

### Fifth Amendment

Plaintiffs' final claim is that they were denied the equal protection of the laws under the Fifth Amendment because the federal defendants refused, for improper political motives,[16] "to furnish investigatory personnel and resources to investigate the murder of Michael Kline in the same manner by which they have furnished personnel and resources to investigate the murder of LCDR Albert Schaufelberger."

 Plaintiffs are correct in their assertion that equal protection is denied when there is unlawful discrimination in the administration of an otherwise neutral law. *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). To make out a cause of action under this principle, a plaintiff must be able to allege that a facially neutral law was applied to similarly situated individuals in a different manner based upon an unlawfully discriminatory motive. The claim of these plaintiffs fails to meet that test for two separate, though interrelated, reasons.

First. Neither the Department of State nor the Federal Bureau of Investigation has the authority to conduct an official investigation under the circumstances present here.

One theoretical source of authority is 18 U.S.C. § 1116 which permits the Depart-

---

**12.** *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

**13.** *Lamont v. Postmaster General,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965); *Kleindienst v. Mandel,* 408 U.S. 753, 762–63, 92 S.Ct. 2576, 2581–82, 33 L.Ed.2d 683 (1972).

**14.** As Justice Stewart stated "There is no constitutional right to have access to particular government information, or to require openness from the bureaucracy ... The Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act." Stewart, "Or of the

Press," 26 Hastings L.J. 631, 636 (.975), *quoted in Houchins v. KQED, Inc.,* 438 U.S. 1, 14, 98 S.Ct. 2588, 2596, 57 L.Ed.2d 553 (1977) (Burger, C.J.).

**15.** Assuming *arguendo* that such a right exists at all.

**16.** The claim is that the defendants had a fear of "the political consequences from the disclosure of the information and the results of a proper investigation upon the Administration's policy and aid and support to the government and military of El Salvador." Complaint at ¶ 44.

ment of Justice (including the FBI) to investigate crimes against the United States [17] where the offense is committed against an "internationally protected person," that is, a representative, officer, employee, or agent of the United States government entitled pursuant to international law to special protection against attack. See generally, *United States v. Layton,* 509 F.Supp. 212 (N.D.Cal.1981). There is no allegation, and no reason for believing, that Michael Kline, a tourist, was an "internationally protected person" within the meaning of that statute.

The only other law with possible relevance is 28 U.S.C. § 533(3) which permits the Attorney General to appoint officials to conduct such investigations regarding "official matters under the control of the Department of Justice and the Department of State" as he may direct. Plaintiffs contend that the killing of Michael Kline should have been considered an "official matter under the control of the Department of State" because Congress has required the President to make a determination and to certify to the Congress that the government of El Salvador had taken all reasonable steps to investigate that killing. *See* P.L. 98–53, 97 Stat. 287, 22 U.S.C. § 2370 (note), amending § 728(e) of the International Security and Development Cooperation Act of 1981.

**17.** See 28 U.S.C. § 533.

**18.** In fact there was compliance. On July 20, 1983, the Secretary of State certified that the government of El Salvador "has taken all reasonable steps to investigate the killing of Michael Kline in El Salvador in October 1982." El Salvador, Certification to Authorize Continued Assistance, 48 Fed.Reg. 36554–55 (August 11, 1983). If the Congress is dissatisfied with that certification or if it believes the certification to be inaccurate, it has of course the means to make its displeasure known. But the statute cannot be construed to give standing to private persons to bring an action for damages.

**19.** For that reason, the statute did not transform the death of Michael Kline into an "official matter under the control of the Department of State" within the meaning of section 533(3) of title 28 so as to authorize an investigation. Moreover, even if the Department of State

That congressional enactment, however, requires only a certification that *El Salvador* has conducted an investigation, and the sole sanction for noncompliance [18] is a cutoff of aid to that country.[19] There is nothing in the statute to indicate that Congress intended to require anything of the Executive Branch other than political and diplomatic efforts to induce the government of El Salvador to investigate; it contains no language which could be construed as authority, let alone a mandate, for an investigation by United States law enforcement officers into the Kline killing.[20]

Second. Even if the federal defendants had authority to conduct an investigation, plaintiffs cannot prevail on their equal protection claim unless these defendants failed for improper motives to investigate the death of Michael Kline in the same manner as they investigated the death of what is alleged to be the similarly-situated Lieutenant Commander Schaufelberger. Again, there is no basis for such an argument.

Kline and Schaufelberger were not similarly situated. According to the complaint itself, the former was a tourist in El Salvador while the latter was a military officer officially assigned to the post of Deputy Commander of the United States Military Assistance Group in El Salvador. Thus, Schaufelberger, unlike Kline, may well have been an "internationally protected person" within the meaning of section 1116

should be deemed to have determined that the death of Michael Kline was such an "official matter," it is doubtful that this would have enabled the FBI to conduct an investigation preparatory to a criminal prosecution, for that agency's *criminal* investigative authority is limited by section 1116.

**20.** Plaintiffs' claim—that they have a legal right which may be vindicated in an action for damages to have the FBI investigate in El Salvador—suffers from two additional defects: (1) the conduct of such an investigation depends in the final analysis neither upon the FBI nor upon the Department of State but upon the government of El Salvador on whose soil such an investigation would have to be carried out, and (2) in view of all these problems and difficulties, it can hardly be found that a failure to investigate constituted a violation of a clearly established right within the meaning of *Harlow v. Fitzgerald, supra.*

and therefore encompassed under the special investigative authority granted by that statute. In any event, there is nothing inherently irrational or arbitrary for a law enforcement agency to make a distinction in the context of an inquiry [21] in a foreign country between United States citizens stationed in that country on official business and those who travel there solely for private purposes.

Prosecutorial and investigative officers have very wide discretion (*Washington v. United States*, 401 F.2d 915 (D.C.Cir. 1968)), and selectivity in the exercise of their authority has long been held not to constitute *per se* a constitutional violation. *Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962). What is impermissible is selective prosecution based upon such grounds as race, religion, the exercise of free speech rights, or protected political activity. *Teague v. Alexander*, 662 F.2d 79, 83 (D.C.Cir.1981); *United States v. Blitstein*, 626 F.2d 774, 782 (10th Cir.1980); *Cox v. Louisiana*, 379 U.S. 536, 581, 85 S.Ct. 453, 470, 13 L.Ed.2d 471 (1965) (Black, J., concurring). Plaintiffs here do not allege discrimination on any of these bases; their claim is that the defendants are concerned over the potential political consequences to the Administration of the results of an investigation—a matter which may give rise to political debate and action in the Congress, the press, and elsewhere, to be sure, but not to an action for damages for impermissible discrimination based on the denial of rights.

## VI

### *Conclusion*

All the claims for damages under this lawsuit must be dismissed as barred by sovereign immunity or qualified individual immunity. These defenses may in some circumstances be regarded as technical or anachronistic—relics of the theory that "the King can do no wrong." *Scheuer v. Rhodes*, 416 U.S. 232, 239, 94 S.Ct. 1683, 1688, 40 L.Ed.2d 90 (1974). Decision after decision has reiterated, however, that the immunity doctrines remain available as defenses to lawsuits against government and its officials. Moreover, whatever may be their philosophical vitality in other circumstances, these doctrines are plainly pertinent in a case such as this where the plaintiffs are seeking enormous damages [22] against United States officials essentially because these individuals did not conduct the kind of inquiry into the killing of an American tourist on the soil of a foreign nation or exert the degree of pressure on another government that plaintiffs have demanded.

The violent death of an American abroad is a tragic occurrence. By virtue of their offices, United States diplomatic officials have the obligation to use their best efforts to protect and assist American citizens and their families in dealing with events in foreign lands, and to conduct vigorous inquiries and to take other diplomatic and political action when foreign governments do not provide adequate protection to the citizens of this nation.[23] But the manner in which these obligations are exercised, and the conduct of foreign relations generally, are constitutionally entrusted to the Executive Branch, with oversight by the Congress, not to the Judiciary.

For a court to hold executive officials liable in damages because in its view their

---

**21.** Assuming that, as the complaint alleges, there was an investigation of the Schaufelberger killing. Such an inquiry, if it took place, could have been based on Lt. Cdr. Schaufelberger's special status under the statute or it might have had the express sanction of the government of El Salvador. Moreover, it is far more likely that the killing of an officer stationed in El Salvador by direction of the United States government could legitimately be regarded as an "official matter under the control of the Department of State" than the killing of a tourist.

**22.** Plaintiffs are asking for compensatory damages in excess of $5 million and for punitive damages in excess of $10 million.

**23.** These, in fact, are among the reasons why the United States maintains vast ambassadorial and consular establishments around the world. See generally, 22 C.F.R. § 71.1.

inquiry on foreign soil was not sufficiently vigorous, their pressure on a foreign government not sufficiently severe, or the information they released not sufficiently extensive,[24] would be to involve the Judicial Branch in matters with respect to which it has neither expertise nor jurisdiction. These are highly judgmental matters, and the officials to whom decision thereon is entrusted are for that reason protected from damage suits by the immunity doctrines discussed above.

Since there is no basis for judicial action, the complaint will be dismissed.[25]

---

**24.** Plaintiffs have sought leave to file an amended complaint adding a claim under the Freedom of Information Act, 5 U.S.C. § 552. The government does not object to the amendment, and it will be granted. The FOIA claim, a clear direction by the Congress for the release of certain types of information, of course survives the present ruling.

**25.** But see note 24, *supra.*