Robert J. RICHARDS, Plaintiff,

v.

Milton S. MILESKI, et al., Defendants.

Civ. A. No. 79–1837.

United States District Court, District of Columbia.

July 21, 1983.

James E. Drew and Joseph Remcho, Robin B. Johansen, Kathleen J. Purcell and Barbara A. Brenner of Remcho & Johansen, San Francisco, Cal., for plaintiff.

Robert C. Seldon, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., and Royce C. Lamberth, Asst. U.S. Atty., Washington, D.C., were on the brief for defendants.

## OPINION

CHARLES R. RICHEY, District Judge.

This matter is before the Court on Defendants' Motion for Summary Judgment,[1]

---

[1] This opinion will resolve plaintiff's claims against Defendants Wilkie, Mileski, Noone and Sullivan. Originally, plaintiff's complaint named eight defendants: Messrs. Noone, McNichol, Sullivan, Mileski, Wilkie, Dingwall, Lavery and Main. However, McNichol and Main are dead, plaintiff dismissed his claim against Lavery and though the Court is unaware of the status of Dingwall, he has not been served and is not therefore a party to this suit. Defendants have filed three dispositive motions in this case. First, Defendants Mileski and Noone filed a Motion for Summary Judgment. Next, Defendant Wilkie filed a separate motion for summary judgment (or dismissal) because he was served after the other defendants had already filed their motion. While setting forth some additional arguments, Wilkie's motion mainly relies on the arguments propounded in the first motion. Because the Court finds these arguments to be dispositive, it will deal with this matter as though all defendants filed one motion.

Finally, Defendant Sullivan filed a separate Motion to Dismiss. Sullivan argues that because he was not served until three years and eight months after the complaint was filed and diligent efforts were not made to effect service upon him promptly, plaintiff's claim against him is barred by the statute of limitations. The Court denies this motion because it finds that plaintiff did exercise due diligence in attempting to locate and serve Defendant Sullivan. Further, the Court will proceed as though De-

plaintiff's opposition thereto, and the entire record herein. Defendants' motion raises two main questions: 1) Does the statute of limitations act as a bar to plaintiff's claim; and 2) Are defendants immune from prosecution? The Court concludes that the statute of limitations is not a bar to plaintiff's claim but immunity is.

## FACTS

Plaintiff worked for the State Department from 1947 through 1953. During that time, federal employees could be removed from their jobs for homosexuality. Plaintiff served as an informant specializing in developing information on the homosexual activity of federal employees. Information provided by him was instrumental in the discharge of at least ten employees from the State Department on grounds of homosexuality.

In 1953, plaintiff was transferred to the United States Information Agency ("USIA")—a new agency formed during the reorganization of the State Department. As part of the reorganization, the security files of many employees were reviewed to assess their continuing suitability for federal employment. In 1953, continued suitability was governed by Executive Order ("E.O.") 10450. That Order provided that investigations should be conducted to determine, *inter alia*, whether an employee had engaged in, "[a]ny deliberate misrepresentations, falsifications or omissions of material fact; [or] [a]ny criminal, infamous, dishonest, immoral or notoriously disgraceful conduct [or] sexual perversion; [or whether any facts were discovered] which furnish[ed] reason to believe that the individual [might] be subjected to coercion, influence or pressure which [might] cause him to act contrary to the best interests of

national security." Mr. Richards' file was one of those reviewed in accordance with the standard set forth in E.O. 10450. As a result of the review, the USIA Security Office concluded that plaintiff's security file was inadequate and recommended further background investigation.[2]

Defendant Wilkie, a Special Agent for USIA was initially assigned the task of investigating plaintiff's background and fitness. He filed a report on November 22, 1954 stating that interviews with co-workers and associates provided uniformly favorable information about plaintiff. However, when during the course of his investigation plaintiff admitted making false statements on his applications for naturalization and for government employment, Defendant Wilkie decided to leave the investigation open until plaintiff provided proof of his place and date of birth. Plaintiff never provided this information.

In February of 1955, plaintiff went to see the Special Agents assigned to his case—Agents Wilkie and Mileski—in an attempt to expedite his security clearance. During this meeting the subject of plaintiff's activities as an informant on homosexuals arose. Mr. Richards' behavior in this regard had raised questions about his own sexuality. At that meeting, plaintiff explained that he had numerous contacts among homosexuals and had volunteered his services as an informant for USIA.

In the course of their investigation of Richards' suitability for continued federal employment, the Special Agents contacted a confidential informant, Thomas Tattersall. Mr. Tattersall named Mr. Richards as a homosexual and signed sworn statements against a number of individuals including plaintiff. It is clear that defendants had some reasons to question the reliability of

fendant Sullivan had joined in the other defendants' original summary judgment motion because the issues discussed therein and decided herein are clearly dispositive of plaintiff's claims against Sullivan as well.

**2.** Plaintiff has not contested the validity of opening such an investigation on him. There were at least five valid reasons for such an inquiry—including the discovery that plaintiff had made false statements on his citizenship papers.

this informant at that time. However, the exact state of his credibility is disputed.

At least partially as a result of the informant's statements, plaintiff was again interviewed by Agents Wilkie and Mileski. During the interview they told Mr. Richards they had an informant's sworn statement claiming that he had participated in homosexual acts with Richards. Here the parties disagree on the facts. The Special Agents allege that Mr. Richards admitted during that interview that he had engaged in homosexual acts. This position is buttressed by the fact that Mr. Richards admitted making "semi-admissions" in a later conversation with Defendant Noone. However, plaintiff claims that he made no admissions of homosexuality. He explains that the "semi-admissions" of which he spoke were with regard to misstating his place of birth.

Pursuant to standard operating procedures, Defendants Mileski and Wilkie offered plaintiff the opportunity to assist in drawing up a statement setting forth the results of the interview. Plaintiff declined to do so. Consequently, the Agents prepared a statement themselves. Plaintiff also declined to examine this statement.

Plaintiff's view of his interview with Wilkie and Mileski varied greatly. Initially, he stated that he had no complaints about the manner of his interrogation. Later, however, Mr. Richards claimed that he had been subjected to duress by Agents Mileski and Wilkie. A meeting was arranged between plaintiff and the Agents to allow him to directly confront them with any allegations of impropriety. After the meeting each Agent prepared a memorandum refuting plaintiff's allegations.

Defendant Noone, the head of the USIA Office of Security, then reviewed the entire investigatory file on plaintiff. He recommended that Richards be given the opportunity to resign or that he be subjected to termination proceedings. Noone's recommendation was approved by General Counsel and the head of the agency. Conse-

quently, Mr. Dingwall, plaintiff's superior approached Mr. Richards and discussed the situation with him. Mr. Richards tendered his resignation on June 20, 1955.

Plaintiff claims that he resigned solely because he "was told that a reliable informant had named [him] and because [he] believed the defendants honestly believed the informant to be reliable." Defendants, on the other hand, argue that the informant played a relatively minor role in plaintiff's investigation and resignation. Rather, defendants emphasize that plaintiff could have been separated solely on the basis of the admissions he made, independent of the informant's statement.

On June 24, 1955, after plaintiff had submitted his resignation but before it became effective, Mr. Mileski sent a memorandum to Mr. Sullivan, Chief of the USIA Special Investigation Branch concerning the reliability of the informant Mr. Tattersall. He noted a number of facts indicating that Mr. Tattersall was not, in fact, reliable. Although all of the individuals involved in the investigation of Richards were informed of this memorandum, no one told plaintiff that the informant's credibility was in doubt.

Mr. Richards' resignation became effective on July 5, 1955. However, he was not able to obtain a copy of his file or learn more about the informant until 1978, after the Freedom of Information ("FOIA") was amended to allow such access. Upon learning of this change, plaintiff requested the desired information. Based upon the information disclosed to him pursuant to his FOIA request, plaintiff decided to file suit.

This action was filed on July 13, 1979. The Court initially dismissed the complaint holding that the statute of limitations had expired. The Court of Appeals, 662 F.2d 65 (D.C.Cir.1981) reversed that ruling, holding that the Court could not conclude on the record before it that plaintiff knew or should have known that his rights were violated prior to his 1978 FOIA request. However, the Circuit Court concluded that the statute of limitations could bar plain-

tiff's claim if subsequent proceedings demonstrated that he knew or should have known of the facts material to this cause of action at an earlier date.

## PLAINTIFF'S CLAIM IS NOT BARRED BY THE STATUTE OF LIMITATIONS.

The statute of limitations provisions applicable to this case are 12 D.C.Code § 301(4) & (8). *See Macklin v. Spector Freight Systems Inc.,* 478 F.2d 979, 994 (D.C.Cir.1973) (where plaintiff's claims arise under federal law for which no limitations period is provided, local law provides the applicable time periods). Pursuant to these sections, plaintiff had one year to file his defamation action and three years for his other claims. The question before the Court is whether plaintiff knew or should have known the facts material to this action for longer than the statutory period in advance of his filing suit.

The response to this inquiry depends upon how this action is characterized and, as could be expected, the parties' characterizations differ drastically. In defendants' view, the most significant aspect of this case is that plaintiff made admissions requiring his dismissal. Defendants thus focus their argument on plaintiff's interview with Wilkie and Mileski during which he allegedly made these admissions. They argue that plaintiff was well aware of the facts surrounding this interview and if he had any objections, they arose at that time and thus are now time barred. Alternatively, defendants argue that if plaintiff did not know the relevant facts in 1955, it is because he did not exercise due diligence to discover them. Defendants base this argument on the fact that plaintiff declined the Special Agents' invitations either to prepare his own statement concerning the interview or to review the summary they prepared. Accordingly, if he did not *know* all the relevant facts in 1955, he *should have*

*known* them, and his claim is thus time barred.

Plaintiff's characterization of this suit is quite different. He alleges that he made no admissions of homosexuality and states that his own statements in no way led to his resignation. Rather, plaintiff explains, he resigned to avoid fighting charges of homosexuality that he believed were founded on the report of an informant defendants believed to be reliable. Thus, in plaintiff's view, this cause of action arose when his 1978 FOIA request revealed that defendants had maliciously used the report of an informant who was known to be unreliable to induce his resignation. Accordingly, because plaintiff could not have known the relevant facts prior to 1978 and he filed suit in 1979, his claim is not time barred.

■ The Court finds that plaintiff's view of this case is the most accurate. The gravamen of his action concerns defendants' use of information provided by Mr. Tattersall to induce his resignation. While it may or may not be true that plaintiff made admissions sufficient to justify his separation, the fact is that he was not separated, he resigned, and he did so upon being confronted with Mr. Tattersall's testimony. His claim is that this testimony was false, that defendants knew it was false and yet they maliciously used it against him. Plaintiff could not have had knowledge sufficient to make these allegations until he received information on the informant through FOIA. His claim thus did not arise until 1978 when he obtained this information. Accordingly, it is not time barred.

## DEFENDANTS ARE ABSOLUTELY IMMUNE FROM PLAINTIFF'S COMMON LAW TORT CLAIMS.

■ Defendants claim that they are entitled to absolute immunity on plaintiff's first, second, third, fourth and eighth causes of action alleging common law torts.[3] A federal official enjoys absolute immunity

---

**3.** The eight counts in plaintiff's complaint are:

1) Fraudulent misrepresentation; 2) Defama-

from common law tort claims so long as his allegedly tortious actions were: a) discretionary; and b) within the "outer perimeter" of his authority. *Barr v. Matteo,* 360 U.S. 564, 575, 79 S.Ct. 1335, 1341, 3 L.Ed.2d 1434 (1959); *Sami v. United States,* 617 F.2d 755, 768–69 (D.C.Cir.1979). Applying the test enunciated in *Barr,* the Court is convinced that the first prong is satisfied—the defendants' challenged actions were discretionary.

■ As Special Agents for the USIA, Defendants Mileski and Wilkie often participated in investigations. Although they had no authority to determine who to investigate, they did exercise discretion in conducting the investigations. Because plaintiff challenges the manner in which these defendants conducted his investigation—confronting him with information from an informant who they allegedly knew to be unreliable—his allegations relate to precisely those discretionary functions for which these defendants are entitled to absolute immunity.

■ Defendant Noone was the Director of the Security Office at USIA. As such, he reviewed the reports prepared by the Special Agents concerning the fruits of their investigation and recommended whether further action should be taken. Mr. Richards challenges Defendant Noone's actions in reviewing his investigative report and recommending that he be separated. It is indisputable, however, that Mr. Noone's decision to make this recommendation was purely discretionary.

■ Defendant Sullivan was the Chief of the USIA Special Investigation Branch. Although plaintiff alleges that Defendant Sullivan was apprised of the continuing results of his investigation, his sole direct role in plaintiff's resignation appears to be that he was the recipient of a memorandum

decrying the unreliability of the informant, Mr. Tattersall. Plaintiff charges Sullivan with failing to inform him of this memorandum. However, Sullivan's decision not to inform plaintiff of the contents of an official memorandum directed to him, was an exercise of his discretion that satisfies the first prong of the *Barr* standard.

■ Furthermore, the Court finds that the defendants were acting within the outer perimeter of their authority at all times relevant hereto, thus satisfying the second prong of the *Barr* immunity test. As Special Agents, Defendants Mileski and Wilkie conducted investigations that they were instructed to undertake and prepared reports of the results of their work. These defendants' dealings with plaintiff occurred precisely within the context of their job description as set forth above. Further, Mr. Noone's decision, based on the evidence before him, to recommend that plaintiff be removed was within the bounds of his authority—his job required him to make such recommendations. Finally, Defendant Sullivan's inaction which plaintiff challenges here was within the ambit of his authority. His job was to run the USIA Special Investigations Branch. It was in this capacity that he received the memorandum on Mr. Tattersall and in this role that he exercised his authority not to disclose it. Thus, the Court concludes that all defendants were acting within the scope of their authority.

Plaintiff seeks to avoid defendants' claims to absolute immunity by characterizing the scope of defendants' authority in a manner which presupposes the conclusion he desires. Thus, plaintiff argues that defendants are not entitled to immunity because it was clearly outside of the scope of their employment to confront plaintiff with the statement of an unreliable informant in a concerted effort to induce his resignation. However, such result oriented tests have

tion of character; 3) Interference with economic advantage; 4) Intentional infliction of severe emotional distress; 5) Damages under the constitutional right to privacy (Amendments 1, 4,

5, & 9); 6) Violations of due process; 7) Deprivation of privileges and immunities; and 8) Common law conspiracy.

been rejected by every Court that has considered them. As explained by Judge Learned Hand:

> [I]t can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine.

*Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949). *See also Nixon v. Fitzgerald,* 457 U.S. 731, 755, 102 S.Ct. 2690, 2705, 73 L.Ed.2d 349 (1982); *Barr v. Matteo, supra.* Accordingly, the Court rejects this argument and holds that defendants are all entitled to absolute immunity from plaintiff's common law tort claims.

### DEFENDANTS ARE IMMUNE FROM SUIT BASED ON PLAINTIFF'S CONSTITUTIONAL CLAIMS.

■ The Supreme Court's most recent pronouncement concerning immunity from constitutional tort claims is *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In *Harlow,* the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* 102 S.Ct. at 2738. The Court has already concluded that defendants were performing discretionary functions. Thus, in deciding the immunity question, the Court must determine whether plaintiff could have stated a constitutional claim under the state of the law in 1955. If plaintiff could not have stated such a claim, then defendants are immune because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Id.* 102 S.Ct. at 2739.

■ In order to demonstrate that he had a cognizable constitutional claim in 1955, plaintiff has attempted to show violations of his rights to procedural and substantive due process. To demonstrate procedural due process violations, plaintiff must establish that he was deprived of a "liberty" or a "property" interest that existed in 1955. *See, e.g., Knauff v. Shaughnessy,* 338 U.S. 537, 544, 70 S.Ct. 309, 313, 94 L.Ed. 317 (1950). However, pursuant to *Bailey v. Richardson,* 182 F.2d 46 (D.C.Cir.1950) *aff'd,* 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352 (1951) it is clear that plaintiff can establish no such interests in existence in 1955. The *Bailey* Court stated, "it has been held repeatedly and consistently that Government employ is not 'property' and ... [w]e are unable to perceive how it could be held to be 'liberty.' " *Id.* at 57.

While plaintiff accepts *Bailey* as barring his claim to any property interest, he continues to assert that he had a liberty interest that was infringed. Plaintiff alleges that this interest was violated because his good name was infringed and he suffered stigma as a result of resigning from government service under charges of homosexuality. Neither the facts nor the law support plaintiff's assertion, however. The facts fail to show that anyone outside of the persons immediately involved in the investigation of plaintiff ever learned that plaintiff was suspected of homosexual conduct. Charges were never leveled against plaintiff, he was not terminated, but rather resigned and he testified at his deposition that he never told friends or subsequent employers about the incident. Given these facts, it is difficult to conclude that plaintiff suffered stigma and loss of his good name.

■ Even if the facts supported plaintiff's claim, the legal basis is lacking. *Bailey* specifically addressed the question of stigma in a fact situation presenting a far stronger case for stigma than there is here —Ms. Bailey was *dismissed* from federal service under charges of disloyalty which

were aired at a number of hearings. Nevertheless, the Court concluded that because plaintiff "had no constitutional right to her office and the executive officers had power to dismiss her, the fact that she was injured in the process of dismissal neither invalidated her dismissal nor gives her right to redress . . . ." *Id.* at 63. Thus, it is clear that under *Bailey,* the facts of this case implicate no procedural due process rights in existence in 1955.

In addition to the procedural due process rights plaintiff asserts, he alleges that he had substantive due process rights that were violated. Plaintiff explains that his substantive due process right consisted of the right to be free of arbitrary government action. In support of this allegation, plaintiff cites a number of cases that were precedential in 1955, however, none of these cases establishes the existence of the right plaintiff asserts.

 Each of the cases plaintiff cites does discuss an individual's right to be free from the government's arbitrary exercise of discretion, however, every case ultimately relies upon the fact that this arbitrary action deprived plaintiff of some recognized right. *See Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952) and *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (associational rights); *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935) (14th amendment rights); *McSurely v. McClellan,* 697 F.2d 309 (D.C.Cir.1982) (4th amendment rights); *Shachtman v. Dulles,* 225 F.2d 938 (D.C.Cir. 1955) (liberty interest in right to travel). Thus, these cases establish that the government may not arbitrarily deprive an individual of a constitutionally protected right. Plaintiff cannot create from them an independent right to be free from any government action that a plaintiff can characterize as arbitrary. Because the Court has already determined that no liberty or property interests are involved here and plaintiff has asserted no other constitutional ba-

sis for his claim, there is no right to substantive due process that was violated here. The Court holds that plaintiff has failed to demonstrate that defendants' actions violated any constitutional right that was clearly established in 1955 such that they knew or should have known that they were acting illegally.

 Neither did plaintiff have any statutory rights that defendant knew or should have known they were violating. For statutory authority plaintiff relies on E.O. 10450 and his common law claims. Initially, *common law* claims do not create *statutory* rights. Further, the Court has already thoroughly discussed plaintiff's common law claims. To hold them applicable here would eviscerate the distinction between common law and constitutional claims which is of great significance in the law of immunity. *See, e.g., Sami v. United States,* 617 F.2d 755, 770 (D.C.Cir.1979). Likewise, the Court rejects plaintiff's argument based on E.O. 10450. Aside from the fact that E.O. 10450 can in no way be said to create a *constitutional* or *statutory* right, that Executive Order provides for no private right of action and thus, cannot provide the basis for suit. *See Kodish v. United Airlines, Inc.,* 463 F.Supp. 1245, 1250–51 (D.Colo.1979). *See also Local 1498, American Federation of Government Employees v. American Federation of Government Employees,* 522 F.2d 486, 492 (3d Cir.1975). Thus, plaintiff has failed to demonstrate that he held any statutory or constitutional rights in 1955 that defendants could have known they were violating. Accordingly, they are immune from liability for plaintiff's constitutional claims under the standard set forth in *Harlow v. Fitzgerald, supra.*

## CONCLUSION

In sum, the Court concludes that plaintiff's claims are not time barred because he could not have discovered the facts essential to his claims until 1978 and he filed suit one

year later. However, summary judgment will be entered for defendants because they are immune from plaintiff's common law and constitutional claims. Defendants have immunity from plaintiff's common law claims under the standard established by the Supreme Court in *Barr v. Matteo*—because their actions were discretionary and they acted within the ambit of their authority. Immunity from plaintiff's constitutional claims is conferred under *Harlow v. Fitzgerald*—because plaintiff held no statutory or constitutional rights in 1955 that defendants could have known they were violating.

An Order consistent with the foregoing will be issued of even date herewith.