BISCAYNE FEDERAL SAVINGS & LOAN ASSOCIATION and Kaufman & Broad, Inc., Plaintiffs,

v.

Richard T. PRATT, Edwin J. Gray, Jamie Jackson, Thomas P. Vartanian, D. James Croft and H. Brent Beesley, Defendants.

Civ. A. No. 85-3183.

United States District Court, District of Columbia.

Oct. 8, 1986.

J. Jonathan Schraub, Golden, Frod & Schraub, Washington, D.C., Patricia Ireland, Carol W. Soret, Stearns Weaver Miller Weissler Alhadeff & Sitterson, Miami, Fla., for plaintiffs.

Michael Martinez, Asst. U.S. Atty., Dept. of Justice, Civil Div., Elizabeth R. Moore, Dept. of Justice, Torts Branch, Washington, D.C., for defendants.

## MEMORANDUM OPINION

SPORKIN, District Judge.

Plaintiffs Biscayne Federal Savings and Loan Association of Miami, Florida ("Biscayne") and its principal shareholder, Kaufman & Broad ("K & B"), seek $30 million in damages from six high-level officials of the Federal Home Loan Bank Board (the "Board") and the Federal Savings and Loan Insurance Corporation (the "FSLIC").[1] On April 6, 1983, the Board, acting pursuant to its statutory authority under 12 U.S.C. Section 1464(d)(6)(A), appointed the FSLIC receiver for Biscayne, whose net worth had reached a negative $30 million. Shortly thereafter, the FSLIC took possession of the property and assets of Biscayne and conveyed them to a new federal mutual association.

Plaintiffs brought suit in the United States District Court for the Southern District of Florida (the "Florida court") within hours after the Board appointed the receiver. In its complaint (Counts I–V), plaintiffs sought an order requiring the Board to remove the receiver. Specifically, Count I alleged that the Board was estopped from

---

1. The individual defendants and their positions at the time of the incidents in question include all three members of the Board, Richard T. Pratt (Chairman), Jamie Jackson and Edwin J. Gray; Thomas P. Vartanian, the Board's General Counsel and director of the Office of General Counsel; 'D. James Croft, director of the Board's Office of Examinations and Supervision; and H. Brent Beesley, director of the Office of FSLIC. Board member Gray was confirmed as a Board member on March 23, 1983, after most of the incidents in question took place.

asserting Biscayne's insolvency as a basis for the receiver's appointment because defendants, singly and in concert, created that insolvency. Count II alleged that the Board's appointment of the receiver was arbitrary and capricious and an abuse of discretion. Count III claimed that in view of the lengthy negotiations between the Board and plaintiffs, the Board abused its discretion by failing to use a less drastic remedy before appointing a receiver. Count IV alleged that the Board's *ex parte* appointment of a receiver violated Biscayne's due process rights under the Fifth Amendment. Count V alleged that the Board violated Biscayne's right to equal protection by appointing a receiver while not appointing one for similarly situated institutions.

The remaining counts (Counts VI–VIII) deal with damage claims against the six individual defendants in their individual capacities. Count VI alleges common law fraud. Count VII complains of a tortious interference with an advantageous business relationship. Count VIII claims that the individual defendants engaged in intentional, constitutional torts violating plaintiffs' Fifth Amendment rights to due process and equal protection.

The Florida court decided to try first the claims against the Board and the FSLIC (Counts I–V) and, after an expedited bench trial, ruled on them on September 9, 1983. *Biscayne Federal Savings & Loan Association v. Federal Home Loan Bank Board,* 572 F.Supp. 997 (S.D.Fla.1983). The Florida court held the contention under Count III to be without merit.[2] The Florida court also found in favor of the Board on Counts I and IV and granted defendants' motion to dismiss plaintiffs' equal protection claim (Count V) with prejudice.[3] In rejecting the

estoppel claim (Count I), the Florida court found that the Board did not create Biscayne's insolvency. *Biscayne Federal Savings & Loan,* 572 F.Supp. at 1031.

The Florida court did find in favor of Biscayne under Count II (abuse of discretion claim), and ordered that Biscayne be returned to its shareholders. After detailing the history of Biscayne's slide into insolvency and communications between K & B and the Board, the Florida court found that the conduct of the staff during the period from late 1982 through April 6, 1983 was arbitrary, capricious and an abuse of discretion. The Florida court found that on several occasions the Board's staff had misrepresented the Board's position with regard to proposals made by K & B in hopes of generating working capital. The Florida court made it clear that it did not ascribe a vindictive motive to the staff's actions, although it characterized the staff's conduct as "outrageous," "outlandish," "egregious" and "wrapped in a shroud of deception."[4] The Florida court ruled that the staff's conduct, unregulated by Board directives or policies, was imputed to the Board. The Board's action in appointing a receiver, therefore, was held to have constituted an abuse of discretion.

The United States Court of Appeals for the Eleventh Circuit reversed the district court's order as to Count II, holding that the district court had no authority to order the dismissal of the receiver. *Biscayne Federal Savings & Loan Association v. Federal Home Loan Bank Board,* 720 F.2d 1499 (11th Cir.1983). The Eleventh Circuit held the "insolvency" of Biscayne by itself justified the appointment of a receiver in that 12 U.S.C. Section 1464(d)(6)(A);[5]

**2.** The Florida court found that the Board "is not obligated to devise a less drastic remedy or agree to assist management of an insolvent institution." *Biscayne Federal Savings & Loan,* 572 F.Supp. at 1036.

**3.** The Florida court ruled that "[u]neven treatment does not constitute invidious intent or discriminatory purpose." *Biscayne Federal Savings & Loan,* 572 F.Supp. at 1043.

**4.** The Florida court's detailed description of conduct in question included no specific reference to the participation of defendants Gray and Jackson.

**5.** Section 1464 expressly authorizes the Board to appoint a receiver for an insolvent association.

... does not require the Board to negotiate with or set guidelines for restructuring a failing association. The undisputed satisfaction of a statutory ground for the appointment of a receiver, coupled with the fact that there was no finding by the trial court that the Board's 'outrageous conduct' in any way contributed to Biscayne's insolvent status as of April 6, thus renders the district court without authority to proceed further.[6]

*Biscayne Federal Savings & Loan,* 720 F.2d at 1504.

The Eleventh Circuit's ruling, coupled with the Florida court's decision, disposed of all claims against the Board and FSLIC, leaving unresolved only the damage claims against the individuals in Counts VI–VIII. On December 5, 1984, the Florida court denied a motion by the individual defendants to dismiss the complaint on several grounds but agreed with defendants' venue arguments that the case be transferred to this Court. Presently before the Court is defendants' motion for summary judgment on the ground that they are shielded from all claims by various legal immunities.

1. *Common Law Fraud and Tortious Interference with Advantageous Business Claims (Counts VI & VII)*

Plaintiffs have asserted common law fraud and tortious interference with advantageous business claims against the six individual defendants. Defendants counter that they are entitled to absolute immunity against these common law claims. The Court agrees and finds that, under the doctrine enunciated by *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), these claims must be dismissed.

Under *Barr,* a federal official is absolutely immune from common law claims arising out of discretionary acts undertaken "within the outer perimeter of his line of duty." *Barr,* 360 U.S. at 575, 79 S.Ct. at 1341. The "outer perimeter" test of *Barr* is met "if the official performed an

act not 'manifestly or palpably beyond his authority' and 'having more or less connection with the general matters committed by law to his control or supervision'...." *Gray v. Bell,* 712 F.2d 490, 505 (D.C.Cir. 1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984), (quoting *Spaulding v. Vilas,* 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896)).

The Supreme Court's decision in *Barr* was motivated by the fear of chilling legitimate official conduct. Justice Harlan concluded that an absolute privilege was required because

... officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government.

*Barr,* 360 U.S. at 571, 79 S.Ct. at 1339.

The *Barr* doctrine is now a legal fixture in this Circuit. *See, e.g., McKinney v. Whitfield,* 736 F.2d 766 (D.C.Cir.1984); *Gray v. Bell,* 712 F.2d 490 (D.C.Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984); *Sami v. United States,* 617 F.2d 755 (D.C.Cir.1979); *Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Institution,* 566 F.2d 289 (D.C.Cir.1977) *(en banc). Barr* has been accorded a "generous reception in two respects: both the persons sheltered and the torts covered have been expansively interpreted." *McKinney,* 736 F.2d at 768. Indeed, "officials have successfully raised *Barr* as a defense to a full range of common law delicts: negligence; malicious use of process; tortious interference with business; false arrest, false imprisonment, and malicious prosecution; blackmail, fraud, and intimidation; and, under some circum-

---

**6.** The circuit court also rejected plaintiffs' cross-appeal of the district court's dismissal of Count III.

stances, assault and battery." [7]  *McKinney*, 736 F.2d at 769 (citations omitted but contained in footnote seven below).  *See also Ricci v. Key Bancshares of Maine*, 768 F.2d 456 (1st Cir.1985).

A careful review of the Florida court's detailed account of the events giving rise to this lawsuit and the job descriptions submitted by defendants compel the finding that defendants' actions were within the "outer perimeter" of their official duties if not the inner perimeter.  Every action each defendant took dealt directly with his official duties to protect depositors and supervise federally-chartered savings and loan associations.

Board members Pratt, Gray and Jackson clearly acted within the scope of their authority when they considered Biscayne's deep insolvency and acted affirmatively on resolutions imposing a receivership on Biscayne.  Pratt, purely in his capacity as the Chief Executive Officer of the Board, received and responded to briefings from its staff on matters relating to discussions between K & B and the Board's staff concerning K & B's repeated "financial" proposals.

Vartanian, the Board's chief legal advisor, and Beesley, as Director of the FSLIC, held discussions with K & B and advised Pratt and the entire Board on the feasibility of K & B's proposals to increase Biscayne's assets.  All of their acts, even those criticized by the Florida court, were certainly not performed "manifestly or palpably beyond [their] authority."  Similarly, Croft, Director of the Board's Office of Examinations and Supervision, was well within his authority when he analyzed and considered K & B's proposal to sell several of Biscayne's branches.

The Florida court's findings of "outrageous," "outlandish" or "arbitrary" conduct do not establish that any of the defendants acted beyond the "outer perimeter" of their authority.  "[S]uch result oriented tests have been rejected by every Court that has considered them," *Richards v. Mileski*, 567 F.Supp. 1391, 1397–98 (D.D.C.1983), for the reasons set forth by Judge Learned Hand:

> [I]t can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds.  A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine.

*Gregoire v. Biddle*, 177 F.2d 579, 581 (2nd Cir.1949).  This principle was recently applied by the First Circuit in a case where FBI agents may have deliberately provided information to a bank that incorrectly connected a loan customer to organized crime.  *See Ricci* 768 F.2d 456, at 462.

Plaintiffs assert that common law tort immunity should not be granted before they have had the opportunity to take discovery pertaining to the scope of defendants' official duties.  The Court disagrees.  Plaintiffs already had the benefit of extensive discovery and a bench trial which included the testimony of the six defendants and seventeen other Board employees.  Granting additional discovery would run counter to Supreme Court direction to determine official immunity summarily.  *See, e.g., Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).  The ample record in this case has afforded plaintiffs substantially more than would be available in other immunity cases.  Despite the ample record and the detailed findings of the

---

**7.** *Garner v. Rathburn*, 346 F.2d 55 (10th Cir. 1965) (negligence); *Berberian v. Gibney*, 514 F.2d 790 (1st Cir.1975) (malicious use of process); *Granger v. Marek*, 583 F.2d 781 (6th Cir. 1978) (tortious interference with business); *Galella v. Onassis*, 487 F.2d 986 (2nd Cir.1973) (tortious interference with business and false arrest for malicious prosecution); *Plourde v.*

*Ferguson*, 519 F.Supp. 14 (D.Md.1980) (false imprisonment, malicious prosecution and assault and battery); *Miller v. DeLaune*, 602 F.2d 198 (9th Cir.1979) (per curiam) (blackmail, fraud, and intimidation); *Wallen v. Domm*, 700 F.2d 124 (4th Cir.1983) (per curiam) (assault) and *Skolnick v. Campbell*, 398 F.2d 23 (7th Cir.1968) (assault and battery).

Florida court, plaintiffs cannot identify the act of any defendant that was not within the scope of his responsibilities as an official of his employing agency.[8] Nowhere in the record is there any suggestion that any defendant at any time acted in a personal capacity. We find, therefore, that defendants are immune from the common law claims set forth in Counts VI and VII.

### 2. Constitutional Tort Claims

In Count VIII, plaintiffs assert that the individual defendants intentionally violated plaintiffs' Fifth Amendment rights by depriving them of a "protected property interest without due process of law" and "of the guarantees of equal protection of the law." The complaint does not identify the specific conduct by which any of the defendants allegedly violated plaintiffs' constitutional rights. Rather, plaintiffs request the Court to make the required findings of constitutional violations from the entire record of the case, including the Florida court decision. They allege that defendants "knew or should have known that their deceptive, outrageous and arbitrary course of action was violating the Constitutional and statutory rights of plaintiffs."[9]

■ Under *Harlow*, qualified immunity insulates officials from lawsuits for money damages unless the officials' conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. Plaintiffs may overcome defendants' qualified immunity only by showing that plaintiffs' constitutional rights were clearly established at the time of the conduct in question. *Mitchell*, 105 S.Ct. at 2820; *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 3021, 82 L.Ed.2d 139 (1984).[10]

Courts considering the applicability of the qualified immunity doctrine have examined the case law to determine whether the official's conduct violated clearly established constitutional rights. *See, e.g., Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (legality of domestic, warrantless wiretapping open question at time of wiretap); *Azeez v. Fairman*, 795 F.2d 1296 (7th Cir.1986); *Richards v. Mileski*, 567 F.Supp. 1391 (D.D.C. 1983). The rights must be clearly established or else "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738.

■ Plaintiffs have identified no case and the Court is unaware of any case hold-

**8.** An official's actions, in addition to being taken within the outer perimeter of his line of duty, must also relate to a discretionary rather than a ministerial function. *See, e.g., Bartel v. FAA*, 617 F.Supp. 190 (D.D.C.1985); *Kline v. Republic of El Salvador*, 603 F.Supp. 1313 (D.D.C.1985). Discretionary functions have been defined as those in which a government official determines what action to take based on an individual, case-by-case analysis and in which his decision includes elements of judgment and discretion. *Id.* Plaintiffs have not alleged that the activities here involved ministerial rather than discretionary acts, and any such claim would be without merit in any event, for these activities related to an analysis of the particular problems facing Biscayne.

**9.** Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint, or for Summary Judgment, pp. 43–44. Plaintiffs do not identify any of their statutory rights allegedly violated by the individ-

ual defendants. They refer, in a footnote, to the Home Owners' Loan Act of 1933, 12 U.S.C. Section 1461 *et seq.*, but understandably omit to state that they have a cause of action under that statute. The Court finds none in this case and accordingly rejects any effort to defeat qualified immunity on the basis of an alleged violation of statutory rights. *See Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

**10.** Prior to *Harlow*, summary judgment on questions of qualified immunity generally required both subjective and objective determinations. *See, e.g., Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). *Harlow*, noting that the existing standard had not adequately shielded federal officials from suit, refashioned the doctrine to make it rely solely on objective factors. In this case, the Florida court's basis for not dismissing the constitutional tort claims—that there "are questions in fact regarding the defendants' mental states"—would seem to contradict *Harlow*.

ing that the conduct of the Board or its staff violated any constitutional right of a savings and loan association's owners in the context of communications or guidelines on proposals to improve the association's financial condition. In the absence of a judicial barometer to gauge defendants' conduct from August 1982—April 6, 1983,[11] the "clearly established constitutional rights" requirement of the Supreme Court's decisions in *Harlow, Davis,* and *Mitchell,* is not met in this case.

■ Plaintiffs explain that their substantive due process rights consisted of the right to be free of arbitrary governmental action that shocked the sense of fair play. In support of this allegation, plaintiffs cite cases that were precedential in 1982. However, the cases cited show a taking of a recognized "right" provided by the Constitution or a specific statute. *See* Plaintiffs' Opp. at 40–41, citing *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (prisoner's "good time credits" created by state law); *Slochower v. Board of Higher Education,* 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956) (privilege against self-incrimination). Plaintiffs cannot create from these cases "an independent right to be free from any government action that a plaintiff can characterize as arbitrary." *Richards v. Mileski,* 567 F.Supp. 1391, 1399 (D.D.C.1983).

The absence of a clearly established constitutional right is also obvious from the holding of the Eleventh Circuit in this case. The Eleventh Circuit held that the taking of plaintiffs' property was duly authorized by statute and specifically noted that the Board's conduct did not contribute to Biscayne's insolvent status as of April 6, 1983. Furthermore, "arbitrary action" as an underpinning of a due process violation assumes that the government owed a legal duty to K & B to consider proposals that, in K & B's view, would improve Biscayne's financial condition. However, neither the Board nor its staff had a duty "to negotiate

with or set guidelines for restructuring" Biscayne. *Biscayne Savings & Loan,* 720 F.2d at 1504. Their duty ran generally to the maintenance of a sound "thrift" system and particularly to Biscayne's *depositors. See* Home Owners' Loan Act of 1933, 12 U.S.C. Section 1461 *et seq. See also Telegraph Savings & Loan Association v. FSLIC,* 564 F.Supp. 880, 892 (N.D.Ill.1982), *aff'd sub. nom. Telegraph Savings & Loan Association v. Schilling,* 703 F.2d 1019 (7th Cir.), *cert. denied.,* 464 U.S. 992, 104 S.Ct. 484, 78 L.Ed.2d 681 (1983) (an insolvent S & L is "gambling with the depositors' money" and the "real gambler is the FSLIC" because its insurance reserves protect the depositors from loss).

Plaintiffs' final constitutional claim in Count VIII is that defendants violated their Fifth Amendment right to equal protection by placing Biscayne in receivership while choosing not to impose a receivership over similarly situated insolvent savings and loan associations. Second Amended Complaint Paragraphs 43, 44. This claim is substantively identical to the equal protection claim that was dismissed by the Florida court (Count V).

■ Plaintiffs, after having been given the chance to obtain discovery, admitted to the Florida court that they did not know the basis upon which they received unequal treatment nor did they allege that they were discriminated against on the basis of some impermissible classification. *Biscayne Federal Savings & Loan,* 572 F.Supp. at 1043. The Florida court, in dismissing Count V, held that plaintiffs could not make a threshold showing that the decision to appoint a receiver was based on an invidious basis such as race. *Id.* Plaintiffs still have failed to allege the requisite element that they were discriminated against on the basis of some impermissible classification. Thus, the equal protection claim must be dismissed. *See, e.g., Teague v. Alexander,* 662 F.2d 79 (D.C.Cir.1981);

---

11. The district court found "no evidence indicating that the staff conducted itself in anything other than a professional manner during the

first phase of negations, which terminated in July 1982." *Biscayne Federal Savings & Loan,* 572 F.Supp. at 1015.

*Kline v. Republic of El Salvador,* 603 F.Supp. 1313 (D.D.C.1985).[12]

### 3. Conclusion

There are certain points that the Court believes must be made in this case. The defendants were, at all times, concerned with the problems of the Biscayne Bank and had been tolerant, even possibly overly tolerant, of Biscayne's worsening financial condition. Indeed, they permitted the plaintiffs to stay in control of Biscayne long after insolvency had occurred. The plaintiffs had every opportunity to avoid being placed in receivership. All they had to do was to come up with a viable plan to become solvent. Instead, the plaintiffs made repeated inadequate offers in furtherance of their "pitch 'till you win" philosophy. They even had the arrogance to request, on several occasions, that the FSLIC pump $25 million of its insurance funds into Biscayne on a non-repayable basis.[13] Indeed, at no time did K & B make a clean offer to infuse capital sufficient to make Biscayne solvent.[14]

The thrift system in this country is under great stress. Bank regulatory agencies must have the flexibility to negotiate appropriate workout solutions with banks facing severe economic problems. It can not be expected that a senior staff member of a bank regulatory agency would engage in hard-hitting negotiations if to do so would subject his modest personal estate to unlimited damage awards. It would be unconscionable and contrary to the concept of proportionality to subject the individual defendants in this case to a damage award of $30 million dollars. This would be particularly so since, as the Eleventh Circuit pointed out, the staff did not cause or have any part in bringing about the insolvency of Biscayne. Since the receivership was, in all respects, lawful and proper, the plaintiffs have suffered no legally compensable damages.

Even if the defendants in this case had made certain mistakes, bank regulatory officials must have certain leeway in discharging their duties in order for the regulatory system to function effectively. Mistakes incurred in carrying out governmental responsibilities must be tolerated or otherwise the regulatory system will not be able to function as it must. The Board and staff members in this case were acting in their governmental capacities. They are entitled to be relieved of the large monetary claims asserted against them that have been hanging over their heads for over three years.

Accordingly, the defendants' motion for summary judgment is granted and this action is dismissed as to all defendants.

---

**12.** The district court analogized the threshold showing to cases concerning selective prosecution.

**13.** *See Biscayne Federal Savings & Loan,* 572 F.Supp. at 1017–1022.

**14.** K & B even backtracked on how much of its own funds would be infused into Biscayne. *Id.*